**AMOCO PRODUCTION COMPANY**

v.

**Donald P. HODEL, et al.**

**Civ. A. No. 84–0916 "L".**

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

Feb. 5, 1986.

---

Liskow & Lewis by Gene W. Lafitte, George J. Domas, Deborah B. Price and Anne E. Tate, New Orleans, La., for plaintiff.

U.S. Dept. of Justice, Leslie K. Dellon, Federal Programs Branch, Civil Div., Dennis G. Linder, Stephen E. Hart, Washington, D.C., Joseph S. Cage, Jr. by Lawrence W. Moon, Jr., Lafayette, La., for defendants.

Milling, Benson, Woodward, Hillyer, Pierson & Miller by Charles D. Marshall, Jr. and David N. Schell, Jr., New Orleans, La., amicus curiae.

## MEMORANDUM RULING

DUHE, District Judge.

### I. FACTUAL BACKGROUND

This matter arises out of a dispute between Amoco Production Company and the federal government over the amount of additional royalties, interest and penalties Amoco owes, if any, for its lease of government-owned natural gas tracts on the Outer Continental Shelf (OCS) offshore Louisiana. Amoco brought this action requesting a declaratory judgment and injunctive relief. Both parties now move for summary judgment.

Amoco is the co-lessee of federal lease OCS–G 2866, granted in 1974 under the Outer Continental Shelf Lands Act. Amoco, as lessee, is required to pay the government a "royalty of 16⅔ percent in amount or value of production saved, removed, or sold" from the leased area. For all times pertinent to this suit, Amoco's share of production from Lease OCS–G 2866 has been sold pursuant to two warranty contracts: one with Florida Gas Transmission Company and a second with Florida Power and Light Co. (FPL). The gas sold under the former contract is immaterial to this action.

The FPL contract was executed in 1965, almost a decade before Amoco acquired Lease OCS–G 2866 from the government. As a warranty contract, Amoco's agreement with FPL did not specify the source or origins of the quantity of gas that Amoco was obligated to deliver. At some point after it acquired Lease OCS–G 2866 from the government, Amoco began to use production from it to satisfy its obligations under the FPL contract.

On February 1, 1977, the U.S. Geological Service issued a value determination letter which established the royalty valuation from Amoco's production of gas from Lease OCS–G 2866. This value determination was made pursuant to 30 C.F.R. 650.-64, and Amoco concedes that since it did not appeal that ruling, it was bound by it until it was superseded.

In July 1982, following an audit, the Royalty Compliance Office of the Minerals Management Service (MMS) ordered Amoco to pay additional royalties owed from Lease OCS–G 2866 in the amount of $10,-424,298.62, for the period of January 1977 through December 1979. In September 1982 the Royalty Compliance Office assessed $3,920,015.52 in interest against Amoco.

Amoco paid both the additional royalties and the late payment assessment of interest, and appealed those rulings of the Royalty Compliance Office to the Director of the MMS. In an order dated April 4, 1983, the Director upheld both rulings.

Amoco then appealed to the Department of Interior Board of Land Appeals ("IBLA"). This body, on December 19, 1983, affirmed the Director's decision.

Amoco has since brought this action seeking declaratory and injunctive relief, requesting among other things:

(1) a declaratory judgment that the decision of the IBLA is null and void,

(2) a permanent injunction against the government barring it from enforcing the IBLA decision,

(3) an order requiring the government to recalculate the royalties owed by Amoco on the basis of the price Amoco received from FPL for the gas.

## II. THE LEGAL ISSUES

As noted earlier Amoco concedes that since it failed to appeal the MMS February 1977 valuation it is barred from challenging that ruling while it was effective. Amoco argues, though, that this ruling was later superseded by another valuation ruling by the MMS, and later by the Natural Gas Policy Act of 1978 (NPGA).

### A. The Notice to Lessee

Amoco argues that it does not owe the additional royalties and interest for the period of July 1, 1978, through December 31, 1979, on the grounds that the February 1, 1977, valuation was superseded by a second in June 1978. This later valuation, Amoco contends, was consistent with the royalties it paid under the FPL contract price.

On June 1, 1978, Amoco was issued Notice to Lessee 78–2 ("NTL 78–2") by the same office which had issued the February 1977 valuation. It is uncontested that Lease OCS–G 2866 is within the scope of the notice. However, after a challenge by Amoco and by others, NTL 78–2 was declared invalid on procedural grounds on January 15, 1979. Since NTL 78–2 was invalid, there is no need for this Court to examine the question of what the effect of NTL 78–2 might have been had it been valid. Since it was invalid it could not have superseded the February 1977 valuation determination.

### B. The Natural Gas Policy Act of 1978

The NGPA was enacted into law on December 1, 1978. Amoco argues that § 3315 of the NGPA established price ceilings on its sale of gas from Lease OCS–G 2866 to FPL, and that as a consequence the government is precluded from recovering royalties based upon a value that exceeds the government-imposed price.

#### 1. Do the Price Ceilings of § 3315 Apply?

15 U.S.C. § 3315, provides in pertinent part:

(a) Application.—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, *sold under any existing contract* or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.

(b) General rule.—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—
(A) the price under the terms of the *existing contract, to which such natural gas was subject* on November 9, 1978, as such contract was in effect on such date; or . . .

The government argues that since Amoco's contract with FPL was a warranty contract, that is, Amoco was not obligated to provide its required quantity of gas to FPL from any particular source, that the gas in Lease OCS–G 2866 was not "subject to" an existing contract as contemplated by § 3315(b)(1)(A). Amoco responds by arguing that the gas was "sold under" the existing contract within the meaning of § 3315(a).

■ On the date in question—November 9, 1978—the gas from Lease OCS–G 2866 *was sold* to FPL under an existing contract. That contract governed the terms and conditions of the sale of the gas. That such contract was a warrant contract, this court thinks, is immaterial. Furthermore, the OCS–G 2866 gas *was subject* to the FPL contract on the date in question— again, November 9, 1978. Contra, *LL & E v. Texaco*, 478 So.2d 926 (4th Cir.1985). That Amoco was not obligated to subject the OCS–G 2866 gas to the FPL contract on that date is immaterial since Amoco *did* subject that gas to the FPL contract by selling it under those terms. Amoco having so opted, the gas in Lease OCS–G was bought within the scope of § 3315, and remains so under any successor contract. Accordingly, this court holds that the price ceilings of § 3315 applied to the gas produced from Lease OCS–G 2866.

This conclusion is supported by the Fifth Circuit's admonition that statutory meaning is to be derived not from reading of a single sentence or section, but from the provisions of the whole law, its object and policy. *ZeMurray Foundation v. United States*, 687 F.2d 97, 102 (5th Cir.1982). The government has not suggested any reason—nor do I think it could—why Congress would have intended to distinguish between warrant contracts and other contracts for purposes of the price ceilings of § 3315. Congress's intent seems clear— the price ceilings of § 3315 apply to gas sold under existing contracts—or successor contracts—not dedicated to interstate commerce. I believe I adhere to that intent in this holding.

2. The Effect of § 3315's Price Ceilings.

Amoco now argues that since after December 1, 1978 (the effective date of the NGPA) it could not exceed the price ceilings of § 3315 for the gas it sold to FPL, the government is precluded from exacting royalty based on a value greater than those price ceilings. The government responds by arguing that the NGPA is simply immaterial to the government's royalty valuations.

Under the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. §§ 1331, *et seq.*, the Secretary of the Interior is authorized to grant leases for the recovery of minerals from the subsoil and seabed of the OCS. *Id.* at § 1337. The Secretary is required to conduct leasing activities "to assure receipt of fair market value for the lands leased and the rights conveyed" by the government. *Id.* at § 1344(a)(4). Under the lease, Amoco agreed that the Secretary could establish minimum values for purposes of computing royalties, and that the Secretary could make such a determination only after due notice had been given to Amoco.

Amoco made such a request in January 1977, and the Department made a determination within a month on the basis of 30 C.F.R. 250.64 (1977; since amended and redesignated as 30 C.F.R. 206.150). The regulation then provided:

The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the lessee, to posted prices [applies only to oil], and to other relevant matters. Un-

der no circumstances shall the value or production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

Applying the factors from the foregoing regulation, the Department established the royalty value for the gas sold to FPL as "well spud dates pursuant to FPC opinion No. 770–A". This valuation was higher than the contract price received by Amoco from FPL—and thus higher than the price controls which went into effect on December 1, 1978. As noted Amoco did not contest this value. Of course, during the entire period in question, Amoco failed to make royalty payments consistent with this determination.

Since it did not contest this February 1977 valuation, Amoco concedes that it is liable for the underpaid royalties from February 1, 1977, until this valuation was superseded. Since this court has rejected Amoco's contention that NTC 78–2 had any effect, Amoco is liable for underpayments from February 1977 to at least December 1, 1978, the effective date of the NGPA. Of course, if the NGPA price controls do not supersede the February 1977 valuation Amoco is liable for underpayments from the entire period.

Citing *Flowers v. Diamond Shamrock Corp.*, 693 F.2d 1146 (5th Cir.1982) and *Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015 (5th Cir.1982), Amoco argues that a royalty valuation cannot exceed the maximum lawful price imposed by a government regulation. In both cases, which involved gas dedicated for sale in the

contracts, the Fifth Circuit held that under Texas law market value for royalty purposes cannot exceed the maximum price at which the gas produced from the lessor's wells may be sold under its particular price categorization in the Act. *Flowers*, 693 F.2d at 1154. These cases, then, are simply inapposite to the present question of whether a royalty valuation by the government made pursuant to 30 C.F.R. 250.64 (1977) can subsequently become invalidated by the imposition of government price controls which are lower than that valuation.

On the surface it may appear inequitable to hold that gas has a value for royalty purposes greater than the price for which it can be sold in the market place. However, it must be remembered that the gas could have been sold at a higher price had Amoco elected to do so on the effective date of the NGPA price controls. Instead it elected to fulfill its obligation to FPL under a contract negotiated many years before at a price which no longer reflected true market value. The royalty owner should not, because of this, suffer a reduction in the value of its royalty on gas which was probably not even discovered when the FPL contract was made. The valuation determination was made in 1977 well in advance of the NGPA price ceilings. The controls imposed were not some arbitrary price but rather kept in place the price Amoco happened to be charging for the gas on November 8, 1978.

*Flowers* and *Bowers* are distinguishable in two senses. First, they govern market value for royalty purposes under Texas law. In the present case, the validity of the royalty valuation made in 1977 is not impeached. The issue is the significance of the later imposition of price controls.

Second, in *Flowers* and *Bowers* neither producer chose the price ceiling which was beneath the royalty valuation. In the present case, Amoco, in effect, did choose the price ceilings imposed upon it.

Amoco, citing *Boutte v. Chevron*, 316 F.Supp. 524 (E.D.La.1970), *aff'd*, 442 F.2d 1337 (5th Cir.1971), also argues that the government's adherence to this royalty val-

uation after the imposition of price ceilings is "confiscatory and violative of the Fifth Amendment." This case, too, is inapposite. *Boutte* simply stands for the proposition that a court may not order a lessee to pay royalties to its lessors based on a valuation which has not been finally determined by the appropriate administrative authority. (Chevron given right to deny higher royalties when the valuation was subject to being overturned by Federal Power Commission).

Finally Amoco argues that the government is bound to an implied covenant of good faith in its performance under the lease, and that that duty has been breached when the government makes a valuation determination exceeding the regulated ceiling price. Essentially, Amoco contends that the subsequent imposition of price ceilings made the February 1977 valuation arbitrary and capricious.

5 U.S.C. § 706 empowers this court to hear appeals from the Department of Interior's Board of Land Appeals. It provides:

To the extent necessary to decision and when presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful, and set aside agency action, findings, and conclusions found to be—

A. arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law;

B. contrary to constitutional right, power, privilege, or immunity;

C. in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

D. without observance of procedure required by law;

E. unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

F. unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

In hearing an appeal under § 706, this Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1970).

It is uncontested that the 1977 valuation determination was made pursuant to the pertinent statutory and regulatory criteria. Thus, the Secretary's valuation was not an abuse of discretion. Amoco's misfortune is that it did not find a purchaser that would have paid what the Secretary in 1977 determined to be the "reasonable value" of the gas, given all the relevant factors. Amoco chose to undersell its gas, simply ignored the February 1977 valuation determination and continued to pay royalties based on a lower rate.

■ Accordingly, this Court holds that even though the price ceilings of the NGPA apply to the gas in question, the initial royalty valuation was proper and was not invalidated by the later imposition of NGPA price ceilings.

## III. THE ASSESSMENT OF INTEREST

Amoco finally argues that the government's assessment of interest was excessive and premature. The former argument is based on the claim that Amoco had no liability for royalties for the July 1978–December 1979 period. This Court's disposition of that claim similarly disposes of Amoco's contention that it owed no interest from that period.

Amoco's prematurity argument is that the government assessment of interest constituted a taking of property without due

process, since the "legal right of the MMS to the additional royalties upon which the interest and penalties were assessed was not yet established by final order or judgment." (Amoco's memorandum in support of MSJ at 33).

█ The government pursuant to 30 C.F.R. 250.49 (since redesignated as 30 C.F.R. 218.50), assessed interest upon Amoco in 1982 for its late payment of past-due royalties. Due process was satisfied by the government. Had Amoco paid the then-due royalties in a timely manner, even under protest, it could have avoided the interest assessment. Accordingly, the interest assessment was not a taking violative of the Fifth Amendment's due process clause.

## IV. CONCLUSION

To recapitulate, this Court finds:

(1) the February 1977 royalty valuation was proper both procedurally and substantively;

(2) the NTL 78–2 of June 1978 did not supersede the February 1977 valuation;

(3) the NGPA of 1978, which took effect December 1, 1978, did not invalidate the 1977 royalty valuation made by the government, even though it did apply to the lease in question; and

(4) the government's assessment of interest was proper and did not deprive Amoco of its property without due process.

Accordingly, summary judgment will be entered in favor of the government and against Amoco for the latter's liability for underpaid royalties and interest from February 1977 through December 1979.