491 So.2d 363 (1986)
The LOUISIANA LAND AND EXPLORATION COMPANY
v.
TEXACO, INC.
No. 86-C-0131.
Supreme Court of Louisiana.
June 23, 1986.
Rehearing Denied September 4, 1986.
*364 Gene Lafitte, George Domas, Anne Tate, Liskow & Lewis, Frederick Veters, Larry Port, Robert E. Plumb, Jr., Patrick J. Butler, James D. Hurley, New Orleans, for applicant.
Charles Marshall, Jr., David Schell, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, P.L.C., New Orleans, for respondent.
WATSON, Justice.
The Louisiana Land and Exploration Company (LL & E), a Maryland corporation, seeks damages from Texaco, Inc., a Delaware corporation, for Texaco's alleged failure to pay proper natural gas royalties from the production on land leased from LL & E.[1]
*365 Texaco moved for partial summary judgment as to gas being sold under contract on the effective date of the Natural Gas Policy Act of 1978.[2] Texaco argued that those royalties were controlled by Section 105 of the NGPA[3] and it was legally precluded from collecting a higher sales price which would reflect actual value. Section 105 applies to intrastate gas "sold under any existing contract." The term "existing contract" is defined as "any contract for the first sale of natural gas in effect on November 8, 1978."[4]
LL & E opposed Texaco's motion for partial summary judgment denying that the NGPA precluded Texaco from paying royalties on the true value of the gas and arguing that Texaco elected to deliver its gas to contract purchasers in lieu of other purchasers.
On cross motion, LL & E received a partial summary judgment against Texaco decreeing Texaco liable for royalties under the LL & E leases on the basis of the prices established under Section 109 of the NGPA.[5] The trial court rejected Texaco's argument that the gas was sold under contracts existing when the NGPA was adopted, because the gas was not dedicated to any particular contracts. Since Texaco chose to meet its contractual obligations with LL & E's gas, the trial court held that Section 109 controlled the price.
*366 Texaco appealed and the trial court judgment was affirmed. The Louisiana Land & Exploration v. Texaco, Inc., 478 So.2d 926 (La.App. 4 Cir., 1985). Deciding that Texaco had improperly paid royalties calculated upon the value of the gas under NPGA Section 105 rather than Section 109, the court of appeal remanded for a determination of damages. A writ was granted to consider the court of appeal judgment. 484 So.2d 130 (La., 1986).
In 1978, NGPA extended price controls over intrastate gas sales. Pennzoil Company v. Federal Energy Regulation Commission, 645 F.2d 360 (5 Cir., 1981), cert. den. 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982); Energy Reserves Group, Inc. v. Kansas Power & Light Company, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).[6] The two-fold purpose of the statute was: (1) protecting consumers by fixing the price of old or flowing gas; while (2) encouraging production by allowing higher prices for new gas. Pennzoil, supra. The regulatory scheme of the NGPA imposed price ceilings on all intrastate gas flowing and being sold under contract when the statute was enacted.[7]
Under Section 105, the maximum lawful price for first sales of natural gas under an existing intrastate contract or any successor to an existing intrastate contract depends upon the contract price in effect on the day before enactment of the NGPA. In 1978 U.S.Cong. & Ad.News 8800, 8999, Section 105 of the NGPA is discussed as follows:
"The conference agreement establishes a maximum lawful price for first sales of natural gas under an existing intrastate contract or any successor to an existing intrastate contract. The maximum lawful price depends upon the contract price in effect on the date of enactment of this Act. * * *"
There is no question that these were first sales;[8] that Texaco's were "existing" contracts; [9] and that the gas was intrastate rather than interstate.
Texaco's contracts were warranty rather than dedication contracts. However, Amoco Production Company v. Hodel, 627 F.Supp. 1375 (W.D.La., 1986) holds that Congress clearly did not intend to distinguish between warranty and dedication contracts in establishing the price ceilings of Section 105. Hodel's interpretation is in accord with the statutory purposes of the NGPA.
ECEE, Inc. v. Federal Energy Regulatory Commission, 645 F.2d 339 (5 Cir., 1981) notes that Section 109 is: "a catchall categorygas that somehow falls between the cracks of the elaborate pricing scheme in sections 102 through 108 will receive some price. It is thus a pricing provision of last resort." Section 109 states that it only applies to gas "which is not covered by any maximum lawful price under any other section of this part."[10] Thus, Section 109 is only applicable when no other section of the NGPA applies. Section 105 has precedence over Section 109. ECEE, supra.
LL & E's gas was "sold under" existing contracts.[11] The "Application" of Section 105 is governed by that term. Section 105(b) speaks of "the existing contract, to which such natural gas was subject", but, the term is used solely with respect to the "maximum lawful price" of old natural gas as distinguished from new natural gas. The statute indicates that all old gas in production would be the subject of a contract. Being "sold under" existing contracts, *367 LL & E's gas is governed by the maximum lawful price in Section 105.[12]
The apparent inequity of calculating LL & E's royalties under the contract prices negotiated by Texaco does not result from any unreasonable action by Texaco. See Henry v. Ballard & Cordell Corporation, 418 So.2d 1334 (La.1982). "[T]he parties are operating in a heavily regulated industry." Energy Reserves Group, Inc. v. Kansas Power & Light Company, 459 U.S. 400 at 413, 103 S.Ct. 697 at 705, 74 L.Ed.2d 569 at 582 (1983). See Shell Oil Company v. Williams, Inc., 428 So.2d 798 (La.1983).
The lower courts erred in granting LL & E's motion for partial summary judgment.[13] Texaco is entitled to partial summary judgment decreeing that its royalty payments to LL & E on gas flowing and sold under contract as of November 8, 1978, are controlled by Section 105 of the NGPA.[14] Whether Texaco has correctly paid the royalties due under Section 105 of the NGPA, "has improperly deducted ... processing fees and other charges", and has properly paid any other royalties, remain as factual issues to be resolved at trial on the merits.
IT IS ORDERED, ADJUDGED, AND DECREED that Texaco, Inc.'s royalty obligations under the subject leases to The Louisiana Land & Exploration Company on gas flowing and sold under contract as of November 8, 1978, are controlled by Section 105 of the Natural Gas Policy Act of 1978.[15]
The judgment of the court of appeal is reversed, and the matter is remanded for trial on the merits.
REVERSED AND REMANDED.
LEMMON, J., dissents.
DENNIS, J., dissents with reasons.
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice, dissenting.
I would affirm the judgments of the district court and the court of appeal in this case. Those courts were correct in concluding that Section 109 rather than Section 105 of the National Gas Policy Act applies.
Section 105 provides that the maximum lawful price, computed under subsection B of Section 105, shall apply, pertinently, to natural gas sold under any existing contract. The "existing contract[s]" to which the statutory language in this case applies are the contracts Texaco entered into with its industrial customers ("first sale" is defined, pertinent to this case, in 15 U.S.C. § 3301(21)(A), as "any sale of any volume of natural gas(iii) to any person for use by such person."). Those are the contracts for which Section 105's maximum lawful price are applicable. Section 105, by its terms, does not apply to Texaco's contracts, or leases, with LL & E, nor to such gas as Texaco has at its disposal by virtue of those independent leases with LL & E.
*368 The only provision of Section 105 which might be read to tie the Texaco-LL & E leases to the Section 105 price limitation is Section 105(b)(1)(A), regarding the Section 105 maximum lawful price, wherein that maximum lawful price is stated to be, with a minor qualification, "the price under the terms of the existing contract [reference here is to the `first sale' contracts Texaco has with its industrial customers] to which such natural gas was subject on November 9, 1978 ..." Were Texaco's LL & E gas subject to the contract entered into between Texaco and its industrial customers, then the Section 105 price limitation would be applicable to the sale by Texaco to its industrial customers, and correspondingly the value of LL & E's gas would be, at most, the price Texaco would be permitted by Federal regulation to receive in the sales to its industrial customers. LL & E's gas, however, was not subject to the contracts which Texaco entered into years earlier with its industrial customers, because that gas was not "dedicated" to the Texaco contracts with its industrial customers. The latter contracts simply committed Texaco to provide unidentified but stated quantities of natural gas. These were warranty contracts, not dedication contracts.
The construction of the pertinent provisions of the Natural Gas Policy Act of 1978 by both the Civil District Court for the Parish of Orleans and the Louisiana Fourth Circuit Court of Appeal, which essentially comports with that contained in the preceding paragraph, surely came as no surprise to Texaco, for that construction is consistent with the opinion expressed by general counsel for the Federal Energy Regulatory Commission, the federal agency charged with administering the Natural Gas Policy Act. In a letter to Tipperary Corporation dated April 18, 1982, (Paragraph 4972, 1982 Federal Program Advisory Service), general counsel for FERC expressed the opinion that Section 105 is applicable to "the price under the terms of the existing contract to which such natural gas was subject on the date of enactment of this Act...." He expressed the view that Congress intended Section 105 to apply only to gas that was subject to an existing intrastate contract on the date of enactment. He went on to recite that "an existing contract cannot be amended to include gas that was not subject to the contract on date of enactment, otherwise producers could rearrange their contractual obligations in an area to funnel all gas production through the most beneficial contract in the area. Such a process would violate the congressional policy expressed in Section 105 to hold intrastate sellers of flowing gas to bargains reached before the date of enactment."
The majority relies heavily upon Amoco Production Co. v. Hodel, 627 F.Supp. 1375 (W.D.La.1986). That United States District Court decision, is, under its holding, not dispositive of the issue before us, for in that case ongoing production from uncommitted gas reserves was not involved, as it is here. Rather, what was involved was a prior two year period (1977-79) of delivered gas. And the United States District Court judge's determination that the price ceilings of Section 105 apply to Amoco's gas under contest in that case was not dispositive of the controversy, for the judge went on to rule in favor of Amoco's opponent, the United States government, concluding that the initial royalty evaluation by the United States Department of the Interior was proper, and was not invalidated by the later imposition of NGPA price ceilings. Furthermore, and most significantly, Amoco Production Co. v. Hodell is currently pending on appeal in the United States Fifth Circuit Court of Appeal, No. 86-4168.
In my view, Texaco, which made nonbeneficial long term gas supply contracts with intrastate industrial users, is not entitled to saddle LL & E with Federal statutory price limits, having contracted to pay LL & E the "value" of its gas. Surely they may not do so by their simply determining to continue supplying their industrial customers with LL & E gas, and without a valid argument that Section 105 of the Natural Gas Policy Act is applicable here.
*369 DENNIS, Justice, dissenting.
Although I agree basically with the statutory construction, I cannot agree that summany judgment should be granted solely on an abstract legal question.
NOTES
[1] LL & E's petition stated four causes of action:

I. First Cause of Action:
A 1928 contract between LL & E, mineral lessor, and Texaco, lessee, obligated Texaco to pay LL & E as royalties on property in Terrebonne, LaFourche, St. Charles and Jefferson Parishes: "a fair and reasonable price at the wells on ¼ of the gas so used or sold, with due regard to the character of the gas and the purpose for which it is used and the prevailing economic conditions." Under subsequent agreements, LL & E accepted Texaco's procedures for computation of the royalties pending contrary notice to Texaco. On October 15, 1981, LL & E gave written notice to Texaco demanding that the royalties be paid in accordance with the contract. On November 25, 1981, LL & E made demand for proper payment of royalties under LSA-R.S. 31:137.
II. Second Cause of Action:
As to the "WK & L Lease" from LL & E to Texaco on property in St. Mary Parish, the petition alleges that the gas produced under this lease is processed by Texaco and used to supply its intrastate industrial gas system and is not committed or dedicated by Texaco to any outside purchaser. Texaco is obliged to pay as royalty under this lease one-eighth of the "market price" at the well. As modified by the unitization agreement, Texaco is required to pay a one-eighth royalty of "reasonable value at the point of delivery in the field, which in no event shall be less than the market value at the point of delivery in the field." Texaco has allegedly failed to pay the required royalties and has improperly deducted processing fees and other charges.
III. Third Cause of Action:
The "Paragraph 26 Leases" from LL & E to Texaco on property in the Parishes of Terrebonne, LaFourche, St. John, St. Charles and Jefferson are the subject of this claim. The royalties under these leases are based on "value" which is defined "`the fair and reasonable value' at the place where used or sold, but in no event less than the highest selling price of gas then currently sold by producers under a contract of sale having a term of three (3) years or more, from any field located in: (i) a five parish area surrounding the leased premises under the Paragraph 26 Leases...."
IV. Fourth Cause of Action:
This involves the "Paragraph 38 Leases" from LL & E to Texaco on property in Terrebonne Parish. The royalties claimed under this cause of action are "a fraction of the `value' at the well of all gas produced and saved or utilized under the lease identified as item (a) of Paragraph 38 above, and a fraction of the `market value' at the well of gas used or sold under the leases...."
LL & E asked for the royalties which Texaco allegedly failed to pay, plus damages under LSA-R.S. 31:137, et seq. for double the amount of the royalties, together with interest, costs, and attorney's fees.
By supplemental petition, LL & E amended its first cause of action by adding the following paragraph:
"8-A
"The 1928 Contract also obligates Texaco to pay as royalty to LL & E `an additional 81/3% of the net profits realized at the mouth of the well' from the total production of gas from each dome described in the 1928 Contact, which net profits are to be based upon the price of gas as determined under subdivision (b) of the Eleventh Article, Paragraph (b) page nine of the 1928 Contract. * * *"
[2] 92 Stat. 3352; 15 U.S.C., § 3301, et seq.
[3] Section 105, 15 U.S.C., § 3315, provides in pertinent part:

"(a) Application.The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.
"(b) Maximum lawful price
"(1) General rule.Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of
"(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or
"(B) the maximum lawful price, per million Btu's, computed for such month under section 3312 of this title (relating to new natural gas).
* * * * * *
"(c) Definition of contract price.For purposes of this section, the term `contract price', when used with respect to any specific date, means
"(1) the price paid, per million Btu's, under a contract for deliveries of natural gas occurring on such date; or
"(2) if no deliveries of natural gas occurred under such contract on such date, the price, per million Btu's, that would have been paid had such deliveries occurred on such date."
[4] 15 U.S.C., § 3301(13).
[5] Section 109, 15 U.S.C., § 3319 provides in pertinent part:

"(a) Application.The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of any natural gas delivered during any month, in the case of any natural gas which is not covered by any maximum lawful price under any other section of this part, including
* * * * * *
"(3) natural gas which was not committed or dedicated to interstate commerce on November 8, 1978, and which was not subject to an existing contract on such day; ..."
[6] In the 1970's, a dramatic disparity developed between the unregulated price of intrastate gas and the lower price of federally regulated interstate gas. Shell Oil Company v. Williams, Inc., 428 So.2d 798 (La., 1983).
[7] However, Section 105 does allow contractual price escalation clauses to continue in operation until the contract price reaches the lawful ceiling. Energy Reserves Group, Inc., supra; Pennzoil, supra.
[8] See the definition in 15 U.S.C., § 3301(21).
[9] See the definition in 15 U.S.C., § 3301(13).
[10] 15 U.S.C. § 3319.
[11] Section 105(a), 15 U.S.C., § 3315(a).
[12] Even if the language of Section 105 were not controlling, the term "subject to" in Section 109 is not synonymous with "dedicated to".
[13] The initial contrary recommendation by Commissioner Holahan was correct. He noted that: "prior to the enactment of the NGPA Texaco remitted to L.L. & E. based upon the prices it received on its sale of the gas to its Mississippi corridor customers. This method of computation for payment was accepted by L.L. & E. when the NGPA was enacted. While L.L. & E's acceptance of such method was conditioned until such time as it might choose to challenge the method, i.e., the pipeline produced prices fix the market for `market rate' purposes, there is no question that such conditioned acceptance was in effect on the date of the applicability of the NGPA and, accordingly, that price on that day became the appropriately adopted Section 105 fixed price."
[14] This is not precisely the decree requested in Texaco's motion for partial summary judgment, but it is "just, legal and proper." LSA-C.C.P. art. 2164. It resolves the primary issue affecting Texaco's liability. LSA-C.C.P. art. 966 C. The parties agree that the substantive legal issue in the case is whether Texaco's liability is governed by Section 105 or Section 109 of the NGPA.
[15] 15 U.S.C. § 3315.