**AMOCO PRODUCTION COMPANY, Plaintiff-Appellant,**

v.

**Donald P. HODEL, Secretary of Department of the Interior, et al., Defendants-Appellees.**

No. 86–4168.

United States Court of Appeals, Fifth Circuit.

April 29, 1987.

Gene W. Lafitte, George J. Domas, Liskow & Lewis, New Orleans, La., for plaintiff-appellant.

Bruce G. Forrest, Robert S. Greenspan, Leslie K. Dellon, Dept. of Justice, Fed. Programs Branch, Civil Div., Washington, D.C., Milling, Benson, Woodward, Hillyer, Pierson & Miller, Charles D. Marshall, Jr., David N. Schell, Jr., New Orleans, La., for defendants-appellees.

Before BROWN, RANDALL and HIGGINBOTHAM, Circuit Judges.

RANDALL, Circuit Judge:

This case concerns a dispute over the valuation of royalties due the federal government from a gas lease on the Outer Continental Shelf. In the district court, the plaintiff, Amoco Production Company ("Amoco"), having exhausted its administrative remedies, sought declaratory and injunctive relief from a decision of the Interior Board of Land Appeals ("IBLA"), a tribunal of the Department of the Interior ("DOI"), affirming the DOI's assessment of extra royalties and penalties due for gas produced and sold by Amoco from a lease off the Louisiana shore. The government moved to dismiss the case for lack of subject-matter jurisdiction on the ground that Amoco's claim was actually a disguised claim for a money judgment in excess of $10,000 and that therefore, jurisdiction properly lay in the Claims Court under the Tucker Act, 28 U.S.C. §§ 1346(a)(2) & 1491(a). The district court refused to dismiss, but held for the government on the

merits, affirming the result reached by the IBLA while disagreeing with its reasoning. Finding that the district court did not have subject-matter jurisdiction over this case, we vacate the judgment of the district court and remand to the district court with instructions to transfer this action to the Claims Court.

## I.

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* ("OCSLA") authorizes the Secretary of the Interior ("Secretary") to grant leases to private individuals or companies for the recovery of oil and gas from the Outer Continental Shelf. *See* 43 U.S.C. §§ 1331 & 1337. It requires that leasing activities "be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." 43 U.S.C. § 1344(a)(4). Pursuant to the OCSLA, the DOI has issued regulations to provide guidance in valuing natural gas.

In December, 1974, the government granted Amoco a lease, OCS–G 2866, to extract oil or natural gas from Block 23 of the Vermilion area, off the coast of Louisiana. The lease provided the government a "royalty of 16–⅔ percent in amount or value of production saved, removed, or sold from the leased area." Amoco used the gas extracted under the Vermilion lease to meet its obligations under a warranty contract executed with Florida Power and Light Company ("FP & L") nine years earlier.[1]

In 1977, Amoco requested a valuation determination letter from the Minerals Management Service ("MMS") stating how royalties from the lease were to be calculated. The departmental regulation in effect at the time of the disputed valuation required that the value of production for computing royalties be the "estimated reasonable value" of the product. 30 C.F.R. § 250.64 (1977).[2] It defined reasonable value as "value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased lands are situated." *Id.* In 1979, Congress revised 30 C.F.R. Pt. 250. The amended version of 30 C.F.R. § 250.64 specifies "regulated prices" as a factor to be considered in determining the value to be used in the computation of royalties. 44 Fed.Reg. 61903 (1979).[3]

The MMS' letter placed a value on gas from the Vermilion lease at a price exceeding $1.50 per thousand cubic feet. This price was determined in accordance with FPC Opinion No. 770–A.1, interpreting 30 C.F.R. § 250.64, which established "just

1. Under the 1965 warranty contract, FP & L enjoyed very low prices. During the period of time relevant to this litigation, FP & L paid Amoco $0.2125/mcf.

2. 30 C.F.R. § 250.64 (1977) stated:
   The value of production, for the purpose of computing royalty, shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the lessee, to posted prices, and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

3. The revised 30 C.F.R. § 250.64 (1979) read:
   The value of production shall never be less than the fair market value. The value used in the computation of royalty shall be determined by the Director. In establishing the value, the Director shall consider: (a) The highest price paid for a part or for a majority of like-quality products produced from the field or area: (b) the price received by the lessee: (c) posted prices: (d) regulated prices: and (e) other relevant matters. Under no circumstances shall the value of production be less than the gross proceeds accruing to the lessee from the disposition of the produced substances or less than the value computed on the reasonable unit value established by the Secretary.
   44 Fed.Reg. 61903 (1979).

and reasonable" rates applicable to the sale of natural gas in interstate commerce. Under this valuation, the royalty due the government from the lease, $0.25 per thousand cubic feet, was greater than the total amount received by Amoco from FP & L, $0.2125 per thousand cubic feet. Amoco did not appeal the valuation placed on the gas by the MMS.

In 1978, Congress passed the Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301 *et seq.*, regulating the price of natural gas. The NGPA became effective on December 1, 1978.

In July, 1982, following an audit, the MMS informed Amoco that Amoco's computation of royalties from the Vermilion lease for February, 1977, through February, 1979, fell $10,424,298.62 short of the royalties due under the 1977 determination letter, largely because Amoco had used its FP & L contract price, instead of the MMS' valuation determination letter, in its computations. The MMS also notified Amoco that it would add late payment charges which amounted to $3,920,015.52.

Amoco paid the assessed royalties and late charges and subsequently appealed both assessments to the MMS. Amoco conceded that it underpaid royalties due the government for gas from the Vermilion lease for the period prior to the NGPA pricing regulations. It asserted, however, that after December 1, 1978, the price of gas from the lease was subject to regulation under § 105 of the NGPA, 15 U.S.C. § 3315. This section states, in relevant part:

(a) Application.—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, *sold under any existing contract* or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.

(b) Maximum lawful price—

(1) General rule.— . . . [T]he maximum lawful price under this section shall be the lower of—

(A) the price under the terms of the existing contract, *to which such natural gas was subject* on November 9, 1978, as such contract in effect on such date;

(B) the maximum lawful price, per million Btu's, computed for such month under section 3312 of this title (relating to new natural gas).

15 U.S.C. § 3315 (emphasis added). Amoco argued that the gas it sold from the Vermilion lease to FP & L under its warranty contract was subject to that existing warranty contract. Thus the maximum lawful price that Amoco could charge for the gas was the $0.2125 per thousand cubic feet it was receiving from FP & L on November 9, 1978. Not only did section 105 of the NGPA make the warranty contract price a ceiling price, but it also created a ceiling for valuation for royalty purposes according to Amoco. The government's valuation of the gas at more than $1.50 per thousand cubic feet, resulting in a royalty greater than the total amount Amoco was receiving on its contract, was, therefore, arbitrary and resulted in a denial of due process under the fifth amendment.[4]

The government argued, and the MMS found, that the gas from the Vermilion lease was not subject to Amoco's warranty contract with FP & L. That contract did not obligate Amoco to sell the gas from the Vermilion lease to FP & L; the contract could have been satisfied with gas from any source; and Amoco could have sold the gas from the lease to another purchaser. The MMS drew a distinction between warranty contracts and dedication contracts, under which gas from the particular source must go to satisfy a particular contract. It found that section 105 might properly apply to the latter but not to the former. The Director of the MMS therefore affirmed

---

**4.** In its action before the MMS and the IBLA, Amoco also argued that the 1977 valuation letter was superseded by Notice of Lessees 78–2, effective July 1, 1978, which established a valuation consistent with the payments made by Amoco. Amoco has abandoned that claim. The principal sum still at issue therefore amounts to only $3,047,692 of the $10,424,298 assessed by the DOI as an additional royalty, together with apportioned late fees and interest.

the assessments. Amoco appealed that decision to the IBLA. The IBLA affirmed the decision of the MMS. *See* 78 IBLA 93 (1983).

Having exhausted its administrative remedies, Amoco filed a Notice of Violation of the OCSLA and subsequently appealed the IBLA's decision to the federal district court. Amoco alleged that the district court had jurisdiction over the action under section 23(b)(1) of the OCSLA, 43 U.S.C. § 1349(b)(1), and also under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce). The DOI filed a motion to dismiss for lack of subject-matter jurisdiction, asserting that Amoco's claim was a disguised claim for money damages and therefore, that exclusive jurisdiction lay in the Claims Court under the Tucker Act, 28 U.S.C. §§ 1346 & 1491(a). The district court denied the DOI's motion to dismiss for lack of jurisdiction. The parties then filed cross-motions for summary judgment and the district court granted the defendants' motion. The court found that, since Amoco was selling gas from the Vermilion lease to FP & L on November 9, 1978, the gas was sold subject to that contract. Thus the ceiling price established by section 105 applied. Nevertheless, the price ceiling did not preclude the MMS' establishing a value for the gas in excess of that ceiling, since the value was established well before the controls took effect. The district court thus affirmed the IBLA's result while rejecting its reasoning. *See* 627 F.Supp. 1375 (W.D.La.1986). This appeal followed.

On appeal, the government raises anew its argument that the district court did not have subject-matter jurisdiction over this case. As it did in its motion to dismiss to the district court, the government contends that Amoco's claim is actually a disguised claim for a money judgment and therefore, that jurisdiction lies in the Claims Court, or in the United States Court of Appeals for the Federal Circuit, which has exclusive jurisdiction over appeals from the Claims Court and over district court decisions based in whole or in part on 28 U.S.C. § 1346. *See* 28 U.S.C. § 1295(a)(2)–(a)(3). Since the question of subject-matter jurisdiction is a threshold question that must be addressed in order to determine whether we can proceed to the merits of the case, we turn to it first.

## II.

The government argues that this action is a suit to obtain monies from the United States, the claim exceeds $10,000, the claim is founded upon a federal statute (unspecified),[5] and the claim would expend itself on the public treasury. A suit of this character, argues the government, can be brought only pursuant to the Tucker Act under which exclusive jurisdiction lies in the Claims Court. In support of this conclusion the government points out *Foote Mineral Co. v. United States*, 654 F.2d 81 (Ct.Cl.1981), a case that the government describes as similar to the instant case that was heard in the Claims Court.

The government contends that the fact that Amoco's complaint does not directly

---

**5.** In its memorandum in support of its motion to dismiss, the government described the suit as a "contract" claim, noting that Amoco and the MMS are parties to lease contracts and that Amoco has paid certain funds to the MMS that it contends are not owed and that should be returned to Amoco if Amoco's position is correct. Amoco, in its response to the government's motion to dismiss, disputed the classification of the claim as a contractual claim. According to Amoco, "the existence of a contract lurking in the background of a legal claim [does not] require[ ] classification of that claim as one of the contract." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 6. In Amoco's view, the claim is a non-contractual claim based upon statutory, regulatory and constitutional provisions. In its reply to Amoco's response to its motion to dismiss, the government appears to have retreated from its characterization of the claim as a contractual claim, noting, correctly, that "[a]s Amoco itself acknowledges ... exclusive Tucker Act jurisdiction is not limited to contract claims." Defendants' Reply Memorandum in Support of Motion to Dismiss at 3 n. 2. However, during oral argument to this court, counsel for the government again discussed the "contractual" nature of this action.

As we explain in our discussion *infra* at III(B), whether this action is a claim founded on a contract or one founded on a statute or regulation is not significant in the instant case and we do not attempt to resolve the question.

ask for money judgment or name the United States as a defendant does not control. According to the government, jurisdiction is vested exclusively in the Claims Court because Amoco's "primary objective" is to recover money allegedly wrongfully withheld by the government. *See Portsmouth Redevelopment & Housing Auth. v. Pierce,* 706 F.2d 471, 474 (4th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). The government cites a Fifth Circuit case, *Warner v. Cox,* 487 F.2d 1301 (5th Cir.1974), as support for Tucker Act jurisdiction in this case, and distinguishes a Tenth Circuit decision that the *Warner* court had distinguished from the case before it.

In response to Amoco's contention that Amoco's purpose in this action goes far beyond any eventual claim for a refund, the government identifies the jurisdictional scheme set up by Congress—to centralize money claims against the government in the Claims Court except those claims under $10,000 or those sounding in tort—and contends that this scheme cannot be defeated by a party's demand for "more" than monetary relief when monetary relief would fully satisfy the party's claims. In this case, argues the government, Amoco's requests for declaratory and injunctive relief are not, notwithstanding Amoco's contentions, "urgent and essential." A money

judgment in Amoco's favor by the Claims Court would, for all practical purposes, accomplish Amoco's litigation aims. To the extent that the Claims Court were to award monies to Amoco in this case, the award would be based on legal reasoning which would stand as *stare decisis.* The government points out that Amoco is no different from other corporations engaged in disputes with the government—disputes of this kind are often not confined to a single episode. Finally, the government argues that Amoco can, in fact, obtain suitable remand relief from the Claims Court if that court were persuaded that such relief was appropriate. *See* 28 U.S.C. § 1491.

Countering the government's allegation that the district court lacked subject-matter jurisdiction over this case, Amoco argues that the fact that it seeks equitable relief rather than money damages is evident from the face of the pleadings. Amoco notes that it does not seek a money judgment and, in fact, no court could render a money judgment since the record is incomplete and would not permit a court to compute the amount of any money that might be due if Amoco prevailed in the appeal.

Also, while Amoco concedes that it may obtain a refund through the refund procedure provided in section 10 of the OCSLA, 43 U.S.C. § 1339,[6] if it obtains a favorable

---

**6.** The OCSLA's refund provision, found at 43 U.S.C. § 1339, provides:

(a) Subject to the provisions of subsection (b) of this section, when it appears to the satisfaction of the Secretary that any person has made a payment to the United States in connection with any lease under this subchapter in excess of the amount he was lawfully required to pay, such excess shall be repaid without interest to such person or his legal representative, if a request for repayment of such excess is filed with the Secretary within two years after the making of the payment, or within ninety days after August 7, 1953. The Secretary shall certify the amounts of all such repayments to the Secretary of the Treasury, who is authorized and directed to make such repayments out of any moneys in the special account established under section 1338 of this title and to issue his warrant in settlement thereof.

(b) No refund of or credit for such excess payment shall be made until after the expiration of thirty days from the date upon which a report giving the name of the person to whom

the refund or credit is to be made, the amount of such refund or credit, and a summary of the facts upon which the determination of the Secretary was made is submitted to the President of the Senate and the Speaker of the House of Representatives for transmittal to the appropriate legislative committee of each body, respectively: *Provided,* That if the Congress shall not be in session on the date of such submission or shall adjourn prior to the expiration of thirty days from the date of such submission, then such payment or credit shall not be made until thirty days after the opening day of the next succeeding session of Congress.

43 U.S.C. § 1339.

According to Amoco, "[a] final judgment upholding Amoco's position as to the proper valuation of the gas that was subject to the DOI's audit can be expected to 'satisfy' the Secretary that an overpayment had been made, in the amount to be calculated upon remand." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 10.

ruling, Amoco contends that its aim in this action goes beyond any eventual claim for a refund. Amoco argues that the DOI's error in valuing the gas for royalty purposes will be perpetuated in future audits concerning this lease (and other leases) if the error is not corrected by a court with jurisdiction to do so. Therefore, to obtain a declaratory judgment establishing that the DOI's valuation is improper in order to prevent erroneous assessment as well as to establish Amoco's right to a refund is the main purpose of this lawsuit. Additionally, Amoco argues that it requires an injunction against future use of the DOI's "erroneous" ruling. Finally, Amoco contends that the remand to the DOI for a recalculation of Amoco's royalty obligations will facilitate a subsequent administrative refund request. In summary, Amoco argues that the declaratory and injunctive relief is "urgent and essential," and is unavailable in the Claims Court. In response to the government's argument that Amoco does not need declaratory or injunctive relief, Amoco says that the government overstates the effect of *stare decisis* since *stare decisis* applies only to the holding of a case, not to the legal reasoning, and because the doctrine has no effect on an administrative tribunal such as the IBLA.

Amoco argues that *Sarasota, Fla. v. EPA*, 799 F.2d 674 (11th Cir.1986), a case involving judicial review of the EPA's refusal to give the city of Sarasota federal grant funds, is directly analogous and supports the conclusion that the federal district court had jurisdiction over this case. According to Amoco, the result in *Sarasota* was based on the fact that "the best Sarasota can hope for in this litigation is a remand to EPA with instructions to reconsider the application," *id.* at 680–81 (footnote omitted), and similarly, all Amoco seeks is a remand to the DOI. Indeed, notes Amoco, if this court were to determine, as a matter of law, that the Secretary cannot establish a royalty value under the OCSLA that exceeds the maximum lawful price at which the gas could be sold, then a remand to the IBLA would be necessary to determine what portion of the royalties were overpayments and for the DOI to initiate the refund process provided in the OCSLA.

### III.

The Tucker Act, 28 U.S.C. §§ 1346(a)(2) & 1491(a), vests concurrent jurisdiction in the Claims Court[7] and the federal district court over any "claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). If the claim exceeds $10,000, the Tucker Act grants exclusive jurisdiction to the Claims Court. 28 U.S.C. § 1491(a)(1). Because adjudication in a federal district court of a lawsuit that falls within the exclusive jurisdiction of the Claims Court would seriously undermine the purposes behind the Tucker Act, courts confronting the issue have consistently held that the Claims Court is the sole forum for the adjudication of such a claim, even though the claim would otherwise fall within the coverage of some other statute conferring jurisdiction on the district court.[8] *Graham v. Henegar*, 640 F.2d 732, 734–35 & n. 6 (5th Cir.1981) (citing cases from various courts of appeals); *but see, e.g., Bor-Son Bldg. Corp. v. Heller*, 572 F.2d 174, 181–82 & n. 14 (8th Cir.1978) (jurisdiction of Court of Claims over claims against United States in excess of $10,000 is not exclusive.). Therefore, if we find

7. The Claims Court, established by the Federal Courts Improvement Act of 1982, P.L. No. 97-164, 96 Stat. 25, inherited the trial jurisdiction of the former Court of Claims. The appellate jurisdiction of the former Court of Claims is now vested in the Court of Appeals for the Federal Circuit. *See, e.g., Hahn v. United States*, 757 F.2d 581, 586 n. 1 (3d Cir.1985).

8. As the Third Circuit explained, "[t]his is because it is only under the terms of the Tucker Act that the United States waives its sovereign immunity to such claims, and this consent to suit is a jurisdictional prerequisite." *Hahn v. United States*, 757 F.2d 581, 586 (3d Cir.1985) (citing *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3654, at 156–57 (1976)).

that this suit falls within the exclusive jurisdiction of the Claims Court under the Tucker Act, our inquiry will be at an end; we will not address the possible bases for district court jurisdiction over this case.

■ We proceed in our analysis of whether the district court had jurisdiction over this case by determining the existence of the three conditions set forth in the Tucker Act which, if satisfied, vest subject-matter jurisdiction exclusively in the Claims Court: (1) the action is against the United States; (2) the action is founded upon the Constitution, federal statute, executive regulation, or government contract; and (3) the action seeks monetary relief in excess of $10,000. *See Portsmouth*, 706 F.2d at 473. Since we find the first two conditions clearly to be satisfied in this case, we will address them only briefly. It is the existence of the third condition that is considerably less clear and upon which we focus our attention.

### A.

■ It is well-established that the limitations of the Tucker Act cannot be avoided by failing to name the United States as a defendant. It is not necessary that the United States be named as a party; an action against a federal agency or official will be treated as an action against the sovereign if " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), or if the effect of the judgment would be 'to restrain the Government from acting, or compel it to act.' " *Larson v. Domestic & Foreign Corp.*, [337 U.S. 682,] 704 [69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949) ]; *Ex Parte New York*, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921). *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). This is a suit against a federal agency and federal officials and any monetary judgment recovered would expend itself on the public treasury. Therefore, we construe this action to be one against the United States for purposes of the Tucker Act.

### B.

■ This lawsuit clearly is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491. Assertions have been made at various points in these proceedings that this claim is founded upon a contract. Counter-assertions that this claim is a non-contractual claim based upon statutory, regulatory and constitutional provisions, *see* discussion *supra* at note 5, have also been made. No assertion has been made that this claim is not founded upon a source of law listed in section 1491, and indeed, no such assertion could legitimately be made. We need not resolve the question of whether this claim is founded upon a contract, or whether it is, instead, founded upon a federal statute, regulation, or the Constitution. In any case, if the claim is for monetary relief in an amount greater than $10,-000, exclusive jurisdiction over it lies in the Claims Court. *Cf. Portsmouth*, 706 F.2d at 474–75 ("[T]he Tucker Act gives the Claims Court jurisdiction over actions against the United States founded upon the Constitution, federal statutes, and regulations, as well as upon government contracts. Consequently, the Claims Court is the proper forum for this action, whether it is characterized as one in contract or one to interpret provisions of the Constitution, federal statutes, or regulations pertaining to the contract.").

In this regard, we do note that if the claim is not one founded upon a contract, some further analysis is required to determine whether the non-contractual claim invoking a federal statute, regulation, or the Constitution, is cognizable in the Claims Court.

■ While the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims against the United States falling within the jurisdiction of the Claims Court under the Tucker Act, *United States v. Mitchell*, 463 U.S. 206, 212–16, 103 S.Ct. 2961, 2965–67, 77 L.Ed.2d 580 (1983), the

Tucker Act does not create substantive rights enforceable against the United States for money damages. *Id.* at 216, 103 S.Ct. at 2967; *see also United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). "A substantive right must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.' 28 U.S.C. § 1491." *Mitchell,* 463 U.S. at 216, 103 S.Ct. at 2967. Despite the broad language of section 1491, not every claim invoking the Constitution, a federal statute or a regulation is cognizable under the Tucker Act; the claim must be one against the United States for money.[9] *See, e.g., id.* (citing *United States v. King,* 395 U.S. 1, 2–3, 80 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)); *Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 1007 (Ct.Cl.1967). Within the sphere of money claims involving or invoking the Constitution, a federal statute, or a regulation, the non-contractual claims considered by the Claims Court can be divided into two classes:

> [T]hose in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation. In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum....
>
> ....
>
> ....

.... Where the claimant is not suing for money improperly exacted or retained (the first class defined above), the historical boundaries of our competence have excluded those instances in which the basis of the federal claim—be it the Constitution, a statute, or a regulation—cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery.... Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.

*Eastport,* 372 F.2d at 1007–09 (citations omitted); *see Mitchell,* 463 U.S. at 216–17, 103 S.Ct. at 2967–68 (citing *Eastport*); *Testan,* 424 U.S. at 401–02, 96 S.Ct. at 954–55 (citing *Eastport*).

■ In this case, the requirement that the source of substantive law upon which the claimant relies can fairly be interpreted as mandating compensation by the federal government for the damage sustained presents no obstacle. On the basis of case-law dealing with refund statutes, we find section 10 of the OCSLA, 43 U.S.C. § 1339 to be susceptible to fair interpretation as legislation that creates a right to monetary relief against the government, that is, that can fairly be interpreted as mandating compensation by the federal government. *See, e.g., Knight Newspapers, Inc. v. United States,* 395 F.2d 353 (6th Cir.1968); *Northwest Pubs., Inc. v. United States,* 253 F.Supp. 828 (D.D.C.1956); *Foote,* 654 F.2d at 84 (citing *United States v. Laughlin,* 249 U.S. 440, 442–43, 39 S.Ct. 340, 341, 63 L.Ed. 696 (1919)).

## C.

Turning now to the third condition for exclusive Tucker Act jurisdiction, we note

---

**9.** The Claims Court also has limited authority to issue declaratory judgments. *See, e.g., Austin v. United States,* 206 Ct.Cl. 719, 723 (declaratory judgments that are "tied and subordinate to a monetary award"), *cert. denied,* 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975); 28 U.S.C. § 1507 (actions under § 7428 of the Internal Revenue Code of 1954). *See* discussion *infra* at III(C).

at the outset that the question of whether this action is an action seeking monetary relief in excess of $10,000 is not susceptible to simple resolution.[10] Rather, we admit up front that this is a "close case" with legitimate arguments to be made for both positions. While we do find that this case is *best* characterized as an action primarily seeking monetary relief (in excess of $10,-000) from the United States, with exclusive jurisdiction therefore lying in the Claims Court, we acknowledge the significant counter-arguments and attempt to address them.

Amoco's complaint asks for three types of relief: (1) a declaratory judgment that the IBLA decision is void and ineffective because it is arbitrary, capricious, an abuse of discretion and is illegal and unconstitutional (fifth amendment violation); (2) a remand to the DOI for "proper calculation" of underpaid royalties and interest penalties for late payments; and (3) a permanent injunction against defendants from enforcing or applying the IBLA decision. The pleadings do not, on their face, ask for a money judgment, and thus, might prompt the conclusion that this case *clearly* falls outside the Tucker Act since Amoco does not directly or expressly ask for money from the government. However, in the "murky" area of Tucker Act jurisprudence, *see Sarasota*, 799 F.2d at 679, one of the few clearly established principles is that the substance of the pleadings must prevail over their form. Courts consistently endeavor to "pierce" the pleadings so that artful pleading does not undercut the jurisdiction of the Claims Court (that is, Con-

gress' intent in enacting the Tucker Act). *Cf. Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C.Cir.1982). It is clear, both in this circuit and elsewhere, that a plaintiff cannot avoid Tucker Act jurisdiction simply by characterizing an action as equitable in nature. *See, e.g., Commonwealth of Massachusetts v. Departmental Grant Appeals Bd.*, 815 F.2d 778, 783 (1st Cir.1987); *Portsmouth*, 706 F.2d at 474; *Amalgamated Sugar Co. v. Bergland*, 664 F.2d 818, 823–24 (10th Cir.1981); *Bakersfield City School Dist. v. Boyer*, 610 F.2d 621, 628 (9th Cir.1979); *American Science & Engineering, Inc. v. Califano*, 571 F.2d 58, 61–62 (1st Cir.1978); *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1228–30 (5th Cir.1976); *Warner*, 487 F.2d at 1305; *Hoopa Valley Tribe v. United States*, 596 F.2d 435, 436, 443, 445–46 (Ct. Cl.1979). "[W]here the real effort of the complaining party is to obtain money from the federal government, the exclusive jurisdiction of the [Claims Court] ... cannot be evaded or avoided by framing a district court complaint to appear to seek only injunctive, mandatory or declaratory relief against government officials or the government itself." *Bakersfield*, 610 F.2d at 628; *see, e.g., Amalgamated Sugar*, 664 F.2d at 824; *S.J. Groves & Sons v. United States*, 495 F.Supp. 201, 208–09 (D.Colo.1980) (citing numerous authorities).

While this basic principle seems straightforward in the abstract, its application is difficult and subject to considerable manipulation, in all but the most clear-cut cases.

---

10. As an aside, we note that the underlying claim here, or, stated differently, the gravamen of the dispute, is that *Amoco* allegedly *owes* the government money. If Amoco had not paid, the government would have had to pursue Amoco for the royalties and late fees. That clearly would not be Tucker Act claim. *Cf. Price, II v. United States*, 621 F.2d 418, 420 (Ct.Cl.1980) ("To the extent plaintiff seeks a ruling from this court that he does not owe the Government the $1,049.31 of the debt which he says he has not yet repaid, the relief sought is in the nature of a declaratory judgment which the court is not empowered to grant. *United States v. King*, 395 U.S. at 5, 89 S.Ct. at 1503."). Nonetheless, for what seem to be justifiable reasons (i.e. fear of losing the Vermilion lease), Amoco paid the

royalties and late fees prior to appealing the assessments and is now in the position of seeking a judgment so that eventually, the money will be returned to it. Why the payment of the royalties and late fees should convert a suit that would clearly not be a Tucker Act suit into one within the exclusive jurisdiction of the Claims Court is not clear. However, as fundamental as this analysis seems, no court that we know of has employed it. Cases in which money has been paid to the government prior to the institution of administrative or judicial proceedings for the purpose of getting a refund are often heard in the Claims Court, notwithstanding the fact that the analysis discussed above would apply.

Courts addressing the Tucker Act question in the numerous cases raising the issue have employed a variety of approaches to the problem and have used varied language to describe their inquiries. *See, e.g., United States v. City of Kansas City, Kansas,* 761 F.2d 605, 608 (10th Cir.1985) ("ultimate aim"); *Hahn v. United States,* 757 F.2d 581, 590 (3d Cir.1985) (" '[i]f the declaratory or injunctive relief a claimant seeks has significant prospective effect or considerable value apart from merely determining monetary liability of the government, ... the district court may assume jurisdiction over the nonmonetary claims.' ") (quoting *Minnesota by Noot v. Heckler,* 718 F.2d 852, 858 (8th Cir.1983)); *Portsmouth,* 706 F.2d at 474 ("primary objective"); *Rowe v. United States,* 633 F.2d 799, 802 (9th Cir. 1980) (Claims Court jurisdiction cannot be avoided when "actual relief resulting from the agency review would be monetary") (citing *Lee v. Blumenthal,* 588 F.2d 1281, 1283 (9th Cir.1979)), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981); *Warner,* 487 F.2d at 1305 ("where the only purpose and sole effect of permitting [review of improper agency action in refusing deferred payment agreement] in the district court is what amounts to a money judgment against the United States," district court lacks jurisdiction); *Alan Guttmacher Inst. v. McPherson,* 597 F.Supp. 1530, 1543 (S.D.N.Y.1984) ("primary objective"); *Heart of the Valley Metro. Sewerage Dist. v. EPA,* 532 F.Supp. 314, 317 (E.D.Wis.1981) ("keystone of this action;" "prime effort"); *Hoopa Valley,* 596 F.2d at 436-37 ("prime effort;" "direct impact"); *see also Gibson v. Block,* 619 F.Supp. 1572, 1575 (N.D.Ind.1985) (surveying the "different formulae [that] exist to test the essence of the plaintiff's claim.").

■ Without attempting to synthesize the intricacies of these various approaches, we can confidently state that, as a general matter, the fundamental inquiry being performed is a search for the "essence" of the claim. In passing on Tucker Act questions,

courts undertake to discern the nature of the relief being sought and focus on the type of relief that will result from the action in determining whether the suit falls within the Tucker Act. Proceeding in our analysis along these lines, we find that this case falls within the exclusive jurisdiction of the Claims Court.[11] In this case, we believe that Amoco seeks, as its "primary objective" or "ultimate aim," *see, e.g., Portsmouth,* 706 F.2d at 474; *City of Kansas City,* 761 F.2d at 608; *Hoopa Valley,* 596 F.2d at 436, the return of some of the money it has paid the government for assessed royalties and late fees. Additionally, the actual relief resulting from the agency review would be monetary. *See Rowe,* 633 F.2d at 802. Indeed, Amoco conceded at oral argument and in its briefs to this court and the district court both that it does seek the eventual return of its money and that money would "flow from," or be the "natural consequence" of, a determination that the DOI improperly valued the gas for royalty purposes. We also find that the injunctive and declaratory relief Amoco seeks does not have significant prospective effect or considerable value apart from determining that the government owes Amoco money. *See Hahn,* 757 F.2d at 590.

Support for the conclusion that Amoco's suit falls within the Tucker Act is found in this court's decision in *Warner v. Cox, supra.* In *Warner,* a defense contractor brought suit against the Secretary of the Navy seeking reversal of an administrative determination requiring the contractor to repay the Navy approximately $55 million paid by the Navy under a contract. The district court found in favor of the contractor and entered an injunction restraining the Secretary of the Navy from recouping the $55 million by refusing to make further payments on the contract. This court reversed, finding that the claim was a suit against the United States within the exclusive jurisdiction of the Court of Claims

11. We note that in *Warner,* this court commented that its analysis "commences and virtually ends with analysis and characterization of Litton's claim and of the relief Litton seeks and has received from the district court. Once this claim is properly identified, the rest becomes plain." *Warner,* 487 F.2d at 1303-04.

(now, the Claims Court). This court found that the judgment against the Secretary would expend itself on the public treasury and would compel the government to pay money in advance of the time specified in its contract, "money which it conceivably might never otherwise have to pay at all." *Warner*, 487 F.2d at 1303. The court concluded that the Administrative Procedure Act could not be invoked as a grant of jurisdiction to the district court for the suit before it, which it labelled as "a contract suit against the United States solely designed to force the sovereign to pay vast sums at a time in advance of its undertaking." *Id.* at 1305. The court stated:

> We recognize the force of Litton's contrary characterization of the case as one in which only review of improper agency action in refusing a deferred payment agreement is sought, action arguably not otherwise reviewable in any court. But we are persuaded that, *where the only purpose and sole effect* of permitting such a review in the district court is what amounts to a money judgment against the United States vastly exceeding that court's Tucker Act jurisdiction, implemented by equitable powers which neither the Court of Claims nor the district court itself sitting as a Court of Claims under the Tucker Act could exercise in such a case, the district court is exercising jurisdiction which Congress never intended to and never did confer upon it.

*Id.* (footnote omitted) (emphasis added). The court further noted that:

> Congress established the Court of Claims to determine claims of this type and magnitude but deliberately withheld equitable powers from it. Since the United States by reason of its nature acts only through agents, it is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA. Little imagination is needed to foresee the consequences of a holding that such claims as this may be reviewed either in a court having power to grant equitable relief against the United States or in one having none. We refuse to believe that Con-

gress intended, in enacting the APA, so to destroy the Court of Claims by implication.

*Id.* at 1306. The court did recognize, however, that "[s]ituations may well arise in which the district court has and should exercise jurisdiction, grounded in some statute other than the Tucker Act, to grant injunctive relief having the incidental effect of requiring payments to be made by the United States." *Id.* at 1305. As an example, the court cited *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir.1971).

In *National Helium*, the Secretary of the Interior terminated a helium purchasing contract without complying with the National Environmental Policy Act requirement that he consider the environmental consequences of his actions and make a statement of their impact. The effect of the contract termination would have been to cause the release of unseparated helium into the atmosphere as the natural gas which it accompanied was burned. The Tenth Circuit found that the district court had jurisdiction over the suit and affirmed the district court's issuance of an injunction against the Secretary prohibiting the contract termination. The case was remanded to the Secretary to meet the environmental requirements. An "incidental" effect of the remand was that during the period of the remand, the contract remained in force and the government was obligated to perform its contractual obligations to purchase helium. *See Warner*, 487 F.2d at 1306.

The *Warner* court, distinguishing *National Helium* from the case before it, stated that "fairly and centrally presented in *National Helium* was a national policy having no necessary connection with the payment of money." *Warner*, 487 F.2d at 1306. In *Warner*, unlike in *National Helium*, "the sole congressional policy involved [was] purely monetary." *Id.* We believe that the suit before us is, no less than *Warner* and unlike *National Helium*, a suit which is "necessarily connected" with the payment of money. The payment of money by the government cannot be said to be an "incidental" effect in this case.

While it does not address the question of "disguised" money claims under the Tucker Act, the case of *Foote Mineral Co. v. United States*, 654 F.2d 81 (Ct.Cl.1981), is nonetheless worthy of mention in this discussion of the proper characterization of Amoco's claim. *Foote* is a case factually similar to the instant case which was heard by the Court of Claims. The court reviewed a decision by the IBLA adverse to the plaintiff on a claim for a refund of royalties paid to the United States and upheld the government's counterclaim for additional royalties. Foote Mineral held leases for mining potassium and sodium on federal lands in Nevada. The leases gave Foote Mineral the right to mine subject to the payment of a royalty to the United States. Under the leases, royalties were to be paid on "leased" minerals but not on "located" minerals. A prerequisite to the issuance of the leases was that the lands mined contain valuable deposits of potassium and sodium. The leases contained recitals that the lands did contain such deposits. Foote Mineral was interested in mining lithium, however, and considered potassium and sodium contaminants. Foote Mineral actually produced lithium from the mines and paid royalties on it. The United States Geological Survey ("USGS"), which administered the leases, however, requested higher royalty payments, whereupon Foote Mineral reviewed the question of whether lithium was a leased or a located mineral. It concluded that lithium was located and thus, that no royalties were due at all. It then appealed the USGS decision and, in that appeal, sought a refund of all royalties previously paid. The refund was

sought under 43 U.S.C. § 1734(c),[12] a statute very similar to the refund statute at issue in Amoco's case, 43 U.S.C. § 1339. *See supra* note 6. The Director of the USGS ruled against Foote Mineral. Foote Mineral then appealed to the IBLA, which also ruled against it without an evidentiary hearing.

Foote Mineral, having exhausted its administrative remedies, sought review of the IBLA's decision in the Court of Claims. The Court of Claims set aside the IBLA decision for procedural error in not holding an evidentiary hearing on the disputed facts. The court then granted summary judgment for Foote Mineral, holding that the leases were invalid because valuable deposits of sodium and potassium did not exist at the mines when the leases were issued. The court determined that Foote Mineral was entitled to recover the royalties paid.

As this discussion illustrates, *Foote* resembles the instant case and it is interesting to note that it was heard in the Court of Claims. Of course, we must recognize that there was no question but that the plaintiff in *Foote* was seeking money from the government. Foote Mineral came into the Court of Claims under a refund statute and did not allege in its complaint that it sought declaratory or injunctive relief as Amoco has done in this case.[13] We mention *Foote*, however, because the government's claim in this case essentially boils down to an allegation that Amoco, in actu-

---

**12.** Section 1734(c) provides:

In any case where it shall appear to the satisfaction of the Secretary that any person has made a payment under any statute relating to the sale, lease, use, or other disposition of public lands which is not required or is in excess of the amount required by applicable law and the regulations issued by the Secretary, the Secretary, upon application or otherwise, may cause a refund to be made from applicable funds.

43 U.S.C. § 1734(c).

**13.** Amoco points out that 43 U.S.C. § 1339 provides the mechanism for the DOI to effect repayment to Amoco of any excess over the amount Amoco was lawfully required to pay,

which repayment is required by that section of the OCSLA. This repayment mechanism is, according to Amoco, an important distinguishing feature between the instant case and *Foote*. Amoco notes that *Foote* was brought pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.*, which contains no "mechanism" for the recovery of excess royalties erroneously extracted by the DOI. Consequently, according to Amoco, to recover royalties, a plaintiff would have to seek a money judgment from the appropriate court. We find this "distinction" to be one without a difference and to have no bearing on the relevancy of *Foote* to the case before us.

ality, seeks exactly what Foote Mineral sought in *Foote*.[14]

Amoco argues that it did not, indeed, could not, ask for a money judgment in this action. Amoco makes much of the fact that it seeks from the district court a declaratory judgment, injunctive relief, and a remand to the DOI with instructions to recalculate the royalties. Amoco stresses that once the district court has afforded such relief, the refund will come, not through a court, but rather, through the refund procedure set forth in the OCSLA. Amoco views this dichotomy as establishing conclusively that this suit is not a suit to obtain money from the government.

We are not persuaded by Amoco's argument that this dichotomy is conclusive evidence of the fact that this is not a Tucker Act suit. As we see it, Amoco is simply doing what it must *in order to get its money.* Indeed, as Amoco itself acknowledges, proceeding in this way and getting a judgment in its favor will assure it the return of its money. We attach great significance to the fact that it appears (both from the statute and from the representa-

tions made by both Amoco and the government at oral argument) that, armed with a declaration that the DOI improperly valued the gas for royalty purposes, and after the recalculation upon remand, the refund process will be instituted and a refund will be forthcoming.[15]

We do, of course, recognize the principle that while "a claimant may not avoid the exclusive jurisdiction of the [Claims Court] merely by framing a complaint to seek nonmonetary relief when the result would be the equivalent of obtaining money damages ... neither does the [Claims Court] possess exclusive jurisdiction simply because a suit for nonmonetary relief may form the basis for a later money judgment." *Tennessee ex rel. Leech v. Dole,* 749 F.2d 331, 336 (6th Cir.1984) (citation omitted), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *see also Commonwealth of Massachusetts,* at 783; *Hahn,* 757 F.2d at 589; *Minnesota by Noot v. Heckler,* 718 F.2d 852, 858 (8th Cir.1983); *Laguna Hermosa,* 643 F.2d at 1379. The case of *Sarasota, Fla. v. EPA,* 799 F.2d 674 (11th Cir.1986), espousing that principle, is cited to us by Amoco as support for

**14.** It is also important to note that Amoco has cited us to several cases, also resembling the instant case, that have been heard in district courts. *See Marathon Oil Co. v. Kleppe,* 556 F.2d 982 (10th Cir.1977); *Amoco Prod. Co. v. Andrus,* 527 F.Supp. 790 (E.D.La.1981); *Gulf Oil Corp. v. Andrus,* 460 F.Supp. 15 (C.D.Cal.1978); *Marathon Oil Co. v. Andrus,* 452 F.Supp. 548 (D.Wyo.1978); *Standard Oil Co. v. Hickel,* 317 F.Supp. 1192 (D.Alaska 1970), *aff'd,* 450 F.2d 493 (9th Cir.1971); *Pan Am. Petroleum Corp. v. Udall,* 192 F.Supp. 626 (D.D.C.1961); *California Co. v. Seaton,* 187 F.Supp. 445 (D.D.C.1960), *aff'd,* 111 U.S.App.D.C. 262, 296 F.2d 384 (1961). The district courts hearing those cases did not address the question of possible Tucker Act jurisdiction.

**15.** We note, in particular, a colloquy between this court and counsel for Amoco that occurred during oral argument on this appeal. A member of the panel asked counsel for Amoco whether, if this court were to find for Amoco on the merits, the administrator could reach any decision other than that Amoco should be entitled to a refund. Counsel for Amoco responded:

I think that he would have to, as a matter of law, agree that our royalty obligation could not exceed the maximum lawful price at which this gas could be sold and that he would recalculate the royalties owed and that

a section 10 proceeding would be initiated for the repayment of overpaid royalties.
Following up, the panel member asked if the administrator would have, under the law, the basis for doing anything other than giving Amoco its money back. In response, counsel for Amoco stated that "[r]ecalculation of the royalties would be a natural consequence." Amoco went on to emphasize, however, that the relief it seeks has to do also with future royalty obligations.

Additionally, we note that Amoco, describing the refund process, has stated:

Under Section 1339 of Title 43 the DOI is in fact required to repay to Amoco any excess over the amount Amoco was lawfully required to pay. Such repayment is mandated "when it appears to the satisfaction of the Secretary that any person has made a payment to the United States in connection with any lease under this subchapter in excess of the amount he was lawfully required to pay...." 43 U.S.C. § 1339. A final judgment upholding Amoco's position as to the proper valuation of the gas that was subject to the DOI's audit can be expected to "satisfy" the Secretary that an overpayment had been made, in the amount to be calculated upon remand.

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 9–10.

its position that the district court had subject-matter jurisdiction over this case.

In *Sarasota,* the city of Sarasota challenged the criteria under which its application for federal grant funds was rejected. The district court found that the city's "ultimate goal" was to receive grant funding and therefore, that jurisdiction lay in the Claims Court. On appeal, the Eleventh Circuit reversed, finding that, under the present posture of the grant process, the city's claims could not be classified as money claims as that term is understood in Tucker Act jurisprudence. *See id.* at 680. The court came to that conclusion notwithstanding its recognition that "[u]ndoubtedly, Sarasota ultimately seeks money as the end product of the grant process." *Id.* The court noted that "the fact that Sarasota's victory on its present claim, if it occurs, may advance it along the path to the grant funding that it covets does not automatically transform every intervening controversy into a Tucker Act claim." *Id.* at 681.

We are urged to find that the district court had jurisdiction over this case because, as in *Sarasota,* the fact that a victory for Amoco in the district court may advance Amoco along the path to a refund does not automatically transform the instant controversy into a Tucker Act claim. While we recognize that the controversy is not *automatically* transformed because money may lurk in the background, we must disagree with the ultimate conclusion that the claim in this case does not fall within the Tucker Act.

The way in which the sound principles set forth by the *Sarasota* court were applied by that court supports the proposition that jurisdiction over the instant case lay properly in the Claims Court instead of the federal district court. The court in *Sarasota* stressed that, while the city of Sarasota ultimately sought money as the end product of the grant process,

> even if Sarasota can persuade a court of competent jurisdiction that EPA has impermissibly promulgated regulations and applied them to Sarasota's application, the best Sarasota can hope for in this

litigation is a remand to EPA with instructions to reconsider the application. Resolution of the present controversy will not entitle Sarasota to federal grant funds nor even provide Sarasota with a declaration that Sarasota would be entitled to grant funds if the remaining steps in the grant process, such as preparation of an environmental assessment, are completed to EPA's satisfaction.

*Id.* at 680–81. We attach great significance to the court's notation that the best Sarasota could hope for in the district court litigation was a remand to EPA with instructions to reconsider the grant application. We attach still greater significance to the court's comment that resolution of that controversy would not entitle Sarasota to federal grant funds or even provide Sarasota with a declaration that Sarasota would be entitled to grant funds if the remaining steps in the grant process were completed to EPA's satisfaction. We note a similar analysis employed by the district court in *Guttmacher:*

> The plaintiffs' primary objective in this action is the unbiased and lawful consideration of their request for money.... [T]hey ultimately seek money, but they appear willing to pursue that money through administrative procedures so long as those procedures are lawful. What they seek from the Court is assurance that they will be.
>
> Examination of those actions cited above which were declared solely within the jurisdiction of the Claims Court demonstrates that those plaintiffs were seeking only a declaration of their absolute right to a money judgment—in effect, they were seeking an award of money. In this action, by contrast ... plaintiffs acknowledge that they have no absolute right to money. They do not seek a declaration from the Court that they are entitled to the grant. They seek only to prevent their request for money from being improperly considered by the agency.

*Guttmacher,* 597 F.Supp. at 1543. This distinction between a declaration of rights that will certainly result in money (within

Claims Court jurisdiction) and a declaration of rights which may or may not result in subsequent payments outside the court's process (within the district court's jurisdiction), was also noted by the Court of Claims in *Pauley Petroleum, Inc. v. United States*, 591 F.2d 1308, 1315, 219 Ct.Cl. 24, *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979).

Because judgment in Amoco's favor *will* result in the payment to Amoco of more than $10,000 by the government, we believe that Amoco's case fits better into the former category, for which jurisdiction resides in the Claims Court. Additionally, that the actual disbursement of government funds would not occur until after the remand to the DOI and the institution of the refund procedure does not alter our conclusion that this is a Tucker Act claim.

Turning next to Amoco's contention that its purpose in this lawsuit goes beyond any eventual claim for monetary relief, we find the argument to be neither persuasive nor dispositive. We acknowledge that the declaratory and injunctive relief Amoco requests would not be available in the Claims Court. That court is a court of limited jurisdiction. *See, e.g., Testan*, 424 U.S. at 398, 96 S.Ct. at 953; *Richardson v. Morris*, 409 U.S. 464, 465–66, 93 S.Ct. 629, 630, 34 L.Ed.2d 647 (1973) (per curiam); *King*, 395 U.S. at 5, 89 S.Ct. at 1503; *American Science & Eng'g*, 571 F.2d at 62.

First, we are not persuaded that Amoco actually needs the declaratory and injunctive relief that it says is "urgent and essential." Amoco's concerns about future audits on the Vermilion lease at issue in this case and about audits on other leases are answered by the doctrines of *stare decisis* and res judicata and, to a lesser extent, by practical considerations as well. *Cf. Foote*, 654 F.2d at 88 (denying declaratory judgment that plaintiff owes no royalties in the future as beyond the power of the Court of Claims, and noting: "We are confident, however, that the defendant's common sense will prevail and that plaintiff's apprehensions about defendant's trying to collect such royalties in the face of the collateral estoppel effects of this opinion may be put to rest.").

■ Second, asking for "more" relief where monetary relief will satisfy the claimant's needs cannot defeat the jurisdictional scheme set up by Congress—to centralize money claims against the government, except those claims under $10,000 and those sounding in tort, in the Claims Court. Congress has carefully set up the division between the two courts and we must be cautious not to undermine that congressional decision. *Cf. Hoopa Valley*, 596 F.2d at 445 ("The division of jurisdiction between the two courts requires that the courts be careful to reject Tucker Act claims masquerading as suits for injunctive or declaratory relief.").

■ Third, where an action primarily seeks monetary relief, it is improper to deny the Claims Court jurisdiction simply because it cannot grant the precise equitable relief requested. *See, e.g., Portsmouth*, 706 F.2d at 474; *American Science & Eng'g*, 571 F.2d at 62 (citing *International Eng'g Co., Div. of A–T–O, Inc. v. Richardson*, 167 U.S.App.D.C. 396, 403, 512 F.2d 573, 580 (1975), *cert. denied*, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976); *Warner*, 487 F.2d at 1305.

Finally, we think it is relevant to note that the remand that Amoco seeks for purposes of directing DOI to recalculate the royalties is, in fact, available in the Claims Court. "[T]he Claims Court can issue declaratory relief that is 'tied to and subordinate to a monetary award.'" *Portsmouth*, 706 F.2d at 474 (citing *S.J. Groves*, 495 F.Supp. at 209); *see also Gibson*, 619 F.Supp. at 1576–77. A 1972 amendment to 28 U.S.C. § 1491 gave the Claims Court limited equitable jurisdiction incidental to its jurisdiction over monetary claims: "In any case within its jurisdiction, the [Claims Court] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." *But cf. Melvin v. Laird*, 365 F.Supp. 511, 517–20 (E.D.N.Y.1973) (discussing legislative history of the 1972 amendment and noting that "[t]he legislative background

... leaves little doubt that the added powers of the Court of Claims to grant incidental relief were in no way intended to oust the jurisdiction of the district courts to act pursuant to its mandamus and declaratory judgment powers.").

## IV.

█ Because we find that this is essentially a claim against the United States for monetary relief in excess of $10,000, the Claims Court has exclusive jurisdiction under 28 U.S.C. §§ 1346(a)(2) & 1491. Accordingly, the district court was without jurisdiction to hear this case. We VACATE the district court's judgment and REMAND to the district court with instructions to transfer the case to the Claims Court pursuant to 28 U.S.C. § 1631. *See Portsmouth,* 706 F.2d at 475; *cf. Kidde, Inc. v. E.F. Bavis & Assocs., Inc.,* 735 F.2d 1085, 1086 (8th Cir.1984). Costs shall be borne by Amoco.