**AMOCO PRODUCTION CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 344–87L.**

United States Claims Court.

Aug. 7, 1989.

George J. Domas, Robert C. Smith, and Matthew K. Brown, New Orleans, La., for plaintiff.

Beverly Sherman Nash, Washington, D.C., for defendant.

## ORDER

### MOODY R. TIDWELL, III, Judge:

This action is before the court on parties' cross motions for summary judgment. At issue is whether a final decision of the Interior Board of Land Appeals (IBLA) was arbitrary, capricious, contrary to law or regulation, or unsupported by substantial evidence when the board found that plaintiff, Amoco, underpaid royalties due from natural gas produced from a federal offshore lease.

### FACTS

On December 1, 1974, pursuant to the Outer Continental Shelf Lands Act (OCS-LA), 43 U.S.C. §§ 1331 *et seq.* (1982), the Secretary of Interior granted lease OCS–G 2866 to plaintiff and two other oil companies as co-lessees. Under the terms of the lease, plaintiff was required to pay the United States a 16⅔ percent royalty in the amount or value of natural gas production saved, removed, or sold from the lease area. Minimum values for the purpose of computing the royalty on production from the lease were to be set by the Secretary in accordance with established regulations.

At the time of this dispute, plaintiff was using its share of production from lease OCS–G 2866 to meet an obligation on a warranty contract held between plaintiff and Florida Power & Light Company (FP & L) executed on March 15, 1965, nine years before plaintiff entered into lease OCS–G 2866. Under the contract plaintiff committed to sell a specific quantity or volume of gas without designating the source of the gas. Plaintiff was free to fill the terms of the contract from any source or supply available, but unilaterally chose to use its share of production from lease OCS–G 2866 to fulfill the terms of the FP & L contract.

On February 1, 1977, in response to a formal request by plaintiff, the United States Geological Survey (USGS) issued a value determination letter to plaintiff putting plaintiff on notice that the natural gas from lease OCS–G 2866 had a value in excess of $1.50 per thousand cubic feet.[1] Upon issuance of the valuation, plaintiff was allowed 30 days within which to appeal the valuation. Plaintiff failed to appeal the determination, and thus the valuation became the basis of royalty plaintiff was to pay on lease OCS–G 2866 for the applicable period. Plaintiff failed to pay royalties per the 1977 valuation, but rather paid royalties based on the FP & L contract price for the gas.

On November 9, 1978, Congress enacted the Natural Gas Policy Act (NGPA), 15 U.S.C. §§ 3301 *et seq.* (1982), effective December 1, 1978. The NGPA established the maximum lawful price for which natural gas was to be sold in the United States.

---

1. Administrative responsibility for the OCS lease program was originally designated to USGS by the Secretary. USGS had the responsibility of determining the royalty value of all gas subject to federal leases. Administrative changes by the Secretary in 1982 resulted in the creation of the Minerals Management Service, with the subsequent transfer of that authority from USGS to MMS. Valuations made by USGS were determined in accordance with Federal Power Commission Opinion No. 770–A, which established "just and reasonable" rates applicable to the sales of natural gas in interstate commerce. The pricing structure used in Opinion No. 770–A was later incorporated into section 104 of the Natural Gas Policy Act (NGPA). *See* 15 U.S.C. § 3314 (1982).

On July 20, 1982, following an audit conducted by the Minerals Management Service (MMS) covering the period from February 1977 to February 1979, plaintiff was informed that the royalties paid on lease OCS–G 2866 had not been paid in accordance with the value determination of February 1, 1977. The resulting deficiency, $10,424,298, was found to be a result of plaintiff's improper use of the FP & L contract price in its computation of royalties due. MMS ordered plaintiff to pay the deficiency as well as a late payment assessment of $3,920,015; a total of $14,344,313.

Plaintiff paid the entire amount and then appealed the demand for additional royalties to the Director of MMS, who affirmed the deficiency. Plaintiff then appealed to the Interior Board of Land Appeals, which, in turn, affirmed the Director's decision. Having exhausted its administrative remedies, plaintiff brought suit in the U.S. District Court for the Western District of Louisiana. The court dismissed plaintiff's claims on the merits. Plaintiff appealed the decision to the United States Court of Appeals for the Fifth Circuit, which vacated the District Court's ruling for lack of subject matter jurisdiction and directed the case to be transferred to the United States Claims Court. After the Supreme Court denied plaintiff's petition for a writ of certiorari, plaintiff filed an amended complaint in this forum. Parties proceeded on cross motions for summary judgment.

### DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, any doubt over whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). In addition, the inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90

S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Plaintiff initially indicated that a factual dispute existed as to the value of royalty payments made by plaintiff's co-lessees during the period of dispute in this case, but later conceded that the issue was not material and is in agreement with defendant and this court that this case is ripe for disposition on summary judgment.

The critical issue in dispute is whether the enactment of the NGPA, which established maximum price ceilings in 1978, effectively superceded the agency's 1977 royalty valuation. The IBLA upheld the validity of the 1977 valuation; plaintiff strongly disagreed. In reviewing this matter, the court may "set aside agency decisions found to be illegal because they are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, not in substantial compliance with procedural requirements, or otherwise contrary to law." *Foote Mineral Co. v. United States*, 228 Ct.Cl. 230, 234, 654 F.2d 81, 84 (1981) (citations omitted).

■ Before addressing the issue in the main, the court feels it proper to discuss plaintiff's contentions that the IBLA failed to properly consider the maximum price ceilings established by 15 U.S.C. § 3315 in its final decision. The statute reads in pertinent part:

(a) Application.—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.

(b) Maximum lawful price—

(1) General rule.— ... [T]he maximum lawful price under this section shall be the lower of—

(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month un-

der section 3312 of this title (relating to new natural gas).

15 U.S.C. § 3315. Subsection (a) establishes three criteria for the application of a subsection (b) maximum price: 1) A first sale of natural gas; 2) that was sold under any existing contract; and 3) that was not committed or dedicated to interstate commerce on November 8, 1978. Subsection (b) determines the actual ceiling price and requires the price to be based on either the NGPA section 102 price, 15 U.S.C. § 3312, which would be higher than the warranty contract price in this case, or the price under the terms of the existing contract "to which such natural gas was subject" on the date the NGPA became effective. The question in dispute is whether subsection (a) controls subsection (b) and whether lease OCS–G 2866 was "subject to" the FP & L contract, or more generally, whether warranty contracts qualify for section 3315 treatment.

Plaintiff contended that the IBLA failed to address whether the language of section 3315(a) applied to the contract between plaintiff and FP & L. Plaintiff argued that since the gas in question fell within the scope of the statute as outlined in subsection (a), the maximum price ceiling set out in subsection (b)(1)(A) automatically applied, thus limiting the amount of royalty that could be exacted. Plaintiff concluded that since it could not be held to pay a royalty in excess of the price for which it was bound to sell the gas as set by the NGPA maximum price ceilings, the IBLA decision was arbitrary and capricious. Defendant, relying on the IBLA decision, countered that 15 U.S.C. § 3312(b) must be given full effect. Since plaintiff's contract with FP & L was a warranty contract, i.e., plaintiff was not obligated to provide its required quantity of gas to FP & L from any particular source, defendant contended that the production from the lease in question was never "subject to" the FP & L

contract as the language of section 3315(b)(1)(A) required. Defendant argued further that plaintiff's contractual obligation to pay royalties based on the 1977 valuation letter should not be lessened because it chose to make a long term warranty contract at 1965 market prices.

Assuming, for purposes of analysis only, that plaintiff's position is correct, that the factors set out in subsection (a) did apply to the gas in question,[2] the court finds that subsection (a) does not foreclose the application of subsection (b) to the case at hand. Subsection (a) defines the limits to which the maximum lawful price determined under subsection (b) may be applied. Plaintiff attempted to discount the credibility or importance of the language of subsection (b), and the IBLA's reliance on that subsection, by claiming that subsection (a) encompassed and controlled the entire scope of subsection (b). Plaintiff thus concluded that the "subject to" language in subsection (b) was included in the "existing contract" language of subsection (a).

It is important to note that the term "existing contract" is referred to in both subsections (a) and (b). Subsection (b), however, goes further in requiring that the gas in question be "subject to" the "existing contract." It is apparent that the language "existing contract" as used in both subsections (a) and (b) refers to the same contract. While the "subject to" language is not specifically set out in subsection (a), its absence does not preclude its application to the statute as a whole. The rules of statutory interpretation require that the court, if possible, give effect to every word that Congress has used in a statute. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). An elementary canon of construction is that a statute should be interpreted "so as not to render one part inoperative." *Mountain States Tel. & Tel. Co. v. Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86

---

**2.** While there is little question that the gas from lease OCS–G 2866 qualified as "a first sale," 15 U.S.C. § 3301(21), and was sold to FP & L under an "existing contract," 15 U.S.C. § 3301(13), there was a dispute as to whether the gas was "committed or dedicated to interstate com-

merce," 15 U.S.C. § 3301(18). While seemingly important as to the application of subsection (a), the court finds the resolution of the issue to be of little relevance in the court's present analysis and non-dispositive in the final outcome of the case.

L.Ed.2d 168 (1985). Plaintiff must qualify under both subsections (a) and (b) for section 3315 to apply.

There is no question that section 3315 does not directly address the issue of warranty contracts and that the statue itself is not a model of clarity. When faced with an ambiguous statute or regulation, the court usually defers to the agency interpretation unless that interpretation is unreasonable. *Rogers v. United States,* 14 Cl.Ct. 39, 46 (1987), *aff'd,* 861 F.2d 729 (Fed.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1930, 104 L.Ed.2d 403 (1989). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Resource Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The IBLA determined that the term "subject to" in subsection (b), when used in its ordinary sense, meant "subordinate to," "controlled by," or "governed by." *Amoco Production Co.,* 78 I.B.L.A. 93, 99 (1983). The IBLA found further that "in a 'conventional sales' contract for the sale and delivery of natural gas, a producer promises to sell all the gas produced from either specific wells or specific fields." *Id.* Under its warranty contract, plaintiff could not show that there was any obligation on its part to deliver gas from lease OCS–G 2866 to the FP & L contract. The IBLA thus concluded that even though plaintiff may have been using the gas from the lease on a consistent basis to fill the terms of the FP & L contract, plaintiff failed to present any persuasive evidence to convince the court that the contract was "subject to" a "conventional" binding agreement.

It is apparent to the court, after a review of the IBLA decision, that the agency had a reasonable basis in finding plaintiff's warranty contract to be outside the ambit of section 3315. For the agency's decision to be upheld, "it is not necessary to find that the agency construction is the only reasonable one ... the judicial function is exhausted when there is found to be a rational basis" for the administrative decision.

*Port Authority of St. Paul v. United States,* 193 Ct.Cl. 108, 120, 432 F.2d 455, 461 (1970). The court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). The court therefore defers to defendant's interpretation of section 3315 and finds that since plaintiff's lease was not "subject to" the FP & L warranty contract, section 3315 did not set a maximum price ceiling on the gas in question.

■ The analysis of the applicability of section 3315, however, diverges from the paramount issue at hand. Even assuming that section 3315 price ceilings did apply, the disposition of this case turns on the more critical issue of whether the NGPA, effective in December 1978, superseded and nullified the original royalty valuation established by the agency in February 1977. Plaintiff argued that its sales to FP & L could not exceed the price ceilings set by section 3315, and that defendant was precluded from exacting royalties based on a value greater than the price ceilings. Defendant countered that section 3315 was immaterial as applied to defendant's original 1977 royalty valuations. The court will rely on the facts, the regulations, and the agency's expertise to resolve this issue.

Under the OCSLA, 43 U.S.C. §§ 1331, *et seq.,* the Secretary of Interior is authorized to grant leases for the recovery of minerals from the Outer Continental Shelf, *Id.* § 1337, and is required to conduct leasing activities "to assure receipt of fair market value for the lands leased and the rights conveyed" by the government. *Id.* § 1334(a)(4). Under the lease in question, plaintiff agreed that the Secretary could establish minimum values for the purpose of computing royalties upon due notice to plaintiff. Plaintiff made a royalty valuation request in January 1977, and the Department made a determination within a month on the basis of 30 C.F.R. § 250.64 (1977); amended and redesignated 30 C.F.R. § 206.150. The regulation specified that a royalty valuation should be based on

the estimated reasonable value of the product, taking into consideration the "highest price paid or offered at the time of production for the majority of like quality products" in the same field or area. *Id.* The regulation did not contain an express limitation precluding price for royalty calculations from exceeding the actual price received for the gas from the lease. The regulation did, however, expressly state that: "under no circumstances shall the value of production ... for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee or ... such reasonable unit value as shall have been determined by the Secretary." *Id.* Applying these factors, USGS established the royalty value for the gas plaintiff eventually sold to FP & L. This value reflected market value, and was thus higher than the contract price received by plaintiff from FP & L.

Plaintiff never contested the 1977 valuation. Plaintiff failed to make royalty payments consistent with the USGS/MMS determination. Yet plaintiff in its present argument contended that it would be inequitable to allow the gas from lease OCS–G 2866 to have a higher value for royalty purposes than the price that it could be sold for on the market place. The valuation determination at issue was made in 1977, prior to the NGPA price ceilings. Plaintiff never attempted to explain how the Secretary, in this case, could have established a royalty value in excess of the price ceiling that did not exist at the time of valuation. Plaintiff could have sold the gas at a higher price had it elected to do so on the effective date of the NGPA price controls. Instead, plaintiff elected to fulfill its obligation to FP & L under a prior negotiated contract at a price that no longer reflected the true market value of the gas. This choice had no bearing on the initial 1977 valuation determination. The court thus finds that the 1977 royalty valuation would not have been invalidated by the imposition of government price controls which were lower than the valuation.

This finding is supported by the maxim that deference be given to an agency's construction of a statutory scheme which it is required to administer. *Chevron,* 467 U.S. at 842–845, 104 S.Ct. at 2781–2783. "In reviewing an agency decision, the agency's own interpretation of the applicable statutes is entitled to substantial deference. Deference is even more clearly in order where an administrative regulation, rather than a statute, is involved." *Marathon Oil Co. v. United States,* 604 F.Supp. 1375, 1379 (D.Alaska 1985), *aff'd,* 807 F.2d 759 (9th Cir.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Defendant had the charge of making royalty valuations per 30 C.F.R. § 250.64, as well as setting prices under the NGPA. The agency's expertise in this area is without question. Plaintiff presented no evidence, other than an inference of unfairness, that the Secretary acted in a manner inconsistent with its own regulations or statutes. That being the case, the agency's position is entitled to deference. The court thus finds that since the 1977 valuation was uncontested by plaintiff and made pursuant to all pertinent statutory and regulatory criteria at the time, the Secretary's interpretation of the royalty valuation and application of the NGPA was neither arbitrary nor capricious.

The court recognizes plaintiff's reliance on two Fifth Circuit cases involving private leases, *Flowers v. Diamond Shamrock Corp.,* 693 F.2d 1146 (5th Cir.1982) and *Bowers v. Phillips Petroleum Co.,* 692 F.2d 1015 (5th Cir.1982). Plaintiff asserted that the cases presented precedence that royalty valuations could not exceed the maximum lawful price imposed by a government regulation. However, both cases are clearly distinguishable from the case at hand. Both *Flowers* and *Bowers* dealt with market values governed by Texas law, matters that have no binding or persuasive effect in this court. Furthermore, neither producer in either case chose the price ceiling which was less than the royalty valuation. Plaintiff in this case allegedly chose the price ceilings imposed upon it. Finally, *Flowers* and *Bowers* are inapposite as to whether a royalty valuation, made pursuant to federal regulation, can subsequently become invalidated by

**596**

the imposition of government price controls which are lower than the valuation. The cases bear no substantive weight.

Plaintiff also relied on a Louisiana Supreme Court decision, *Louisiana Land and Exploration Company v. Texaco Inc.*, 491 So.2d 363 (La.1986), *cert. denied*, 483 U.S. 1009, 107 S.Ct. 3239, 97 L.Ed.2d 744 (1987) [*LL & E*], for the proposition that a royalty valuation cannot exceed a maximum price ceiling. While the facts in *LL & E* are very similar to the present dispute, the case is also distinguishable. In *LL & E* the disputed royalty determination was governed by a contract between private parties that was not limited or bound by federal regulation, as was the case here. Furthermore, the Louisiana Supreme Court, faced with the same problem of determining whether a warranty contract is controlled by the NGPA price ceilings, relied upon *Amoco Production Co. v. Hodel*, 627 F.Supp. 1375 (W.D.La.1986), *vacated*, 815 F.2d 352 (5th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988), which was this very case; the same decision that was transferred to this court after the Fifth Circuit found that it and the district court had no subject matter jurisdiction over this case. The court finds *LL & E* neither probative nor persuasive.

### CONCLUSION

The court thus finds that plaintiff failed to properly comply with the 1977 royalty valuation and that the IBLA decision was neither arbitrary nor capricious, nor contrary to law or regulation. Plaintiff's attempt to construe the language of 15 U.S.C. § 3315, enacted in 1978, to avoid paying royalties which were assessed in 1977 and never disputed by plaintiff, is without merit. In light of the ambiguous nature of section 3315 and the question of whether it actually effected the 1977 royalty valuation, and the failure of plaintiff to present substantial evidence in support of its interpretation of section 3315, the court finds it proper to give deference to the agency's reasonable interpretation. The court thus affirms the IBLA decision and grants defendant's motion for summary judgment. Plaintiff's motion for summary judgment is denied and the Clerk is directed to dismiss the complaint accordingly. Costs.

IT IS SO ORDERED.