UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 00-30459

TEXACO INC., TEXACO EXPLORATION
& PRODUCTION INC.,

Plaintiffs-Appellees

VERSUS

JOHN M. DUHÉ, JR., GLADYS DUHÉ DEUTSCHLE,
JOSEPH PRESTON Duhé, EDNA ACKAL BROWER,
ELIAS ACKAL, also known as BO ACKAL

Defendants-Appellants

Appeal from the United States District Court
for the Western District of Louisiana

November 29, 2001

BEFORE: LAY*, GREENBERG**  and MICHEL***, Circuit Judges .

GREENBERG, Circuit Judge.

---

*Circuit Judge of the Eighth Circuit, sitting by designation.

**Circuit Judge of the Third Circuit, sitting by designation.

***Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

This matter comes on before this court on appeal from an order of the United States District Court for the Western District of Louisiana entered on March 21, 2000, making final an order granting partial summary judgment to the plaintiffs-appellees, Texaco Inc. and Texaco Exploration and Production Inc. ("Texaco") entered on February 22, 2000.  The district court granted Texaco a summary judgment dismissing the claim of the defendants-appellants, John M. Duhé, Jr., Gladys Duhé Deutschle, and Joseph Preston Duhé ("Duhés") and Edna Ackal Bower and Elias Ackal ("Ackals"), seeking recovery of allegedly underpaid royalties on natural gas production between March 23, 1988, and December 31, 1992, in the Bateman Lake Field, St. Mary Parish, Louisiana. We will refer to this claim as the "gas flow claim."   Appellants, however, do not appeal the judgment as to the Duhés, even though they have joined in this appeal, because the Duhés were lessors of mineral property located in Iberia Field, Iberia Parish, Louisiana, from which the gas was allocated in connection with contracts that do not form the basis of the gas flow claim.  See Br. of Appellants at 2 n.2.   For the reasons we set forth below, we affirm the judgment of the district court.

## I.  BACKGROUND

### A.  Factual History

The Ackals are owners of mineral producing property located in the Bateman Lake Field.  Texaco produced gas from the Bateman Lake Field and, pursuant to contract,

promised to pay royalties to the Ackals on the basis of the "reasonable value" of their natural gas.  See Bateman Lake Field Unitization Agreement, ¶ XIII (Exhibit C-2, submitted in support of Texaco's Motion for Partial Summary Judgment on Gas Flow Claims) (unbound).

Texaco delivered gas to purchasers through the Louisiana Industrial System pipeline ("LIS"), which it constructed and operated to transport Texaco-produced gas to end-users within Louisiana.  See R.E. of Appellees #2 (Affidavit of Gary Taylor at ¶¶ 2-7).  Louisiana Power and Light ("LP&L"), one of the purchasers, entered into a number of contracts with Texaco for gas distribution prior to November 8, 1978.  See id. at ¶ 5.[1] This dispute concerns the royalties generated from the sale of Bateman Lake Field gas to LP&L.

By a document dated June 4, 1982, Texaco and LP&L entered into a Compromise and Settlement Agreement, amending and restating their obligations under the several individual LP&L gas purchase contracts.  See id. at ¶¶ 9-12.  Owing in part to its increasing inability to meet LP&L's natural gas demands, Texaco agreed to pay LP&L over $1 billion in exchange for LP&L's agreement to curtail its short term volume requirements.  See Compromise and Settlement Agreement, pp. 3-5 (Exhibit 1 to Affidavit of Gary Taylor, submitted in support of Texaco's Motion for Partial Summary Judgment on Gas Flow Claims) (unbound).   The Agreement also contractually

---

[1] Specifically, LP&L entered into LIS contracts with Texaco on June 17, 1959, May 7, 1968, May 22, 1970, and December 5, 1973.

committed gas from the Bateman Lake field as a supply source of the LP&L contracts.
See R.E. of Appellees #2 (Affidavit of Gary Taylor at ¶ 11).   However, the 1982
Agreement maintained the prices and expiration dates of the original contracts.  See
Compromise and Settlement Agreement, p. 12 (Exhibit 1 to Affidavit of Gary Taylor,
submitted in support of Texaco's Motion for Partial Summary Judgment on Gas Flow
Claims) (unbound).

On April 12, 1987, Texaco filed for protection under Chapter 11 of the
Bankruptcy Code.  On March 23, 1998, the bankruptcy court issued its Confirmation
Order adopting Texaco's Second Amended Joint Plan of Reorganization and discharging
all claims against Texaco which arose prior to the date of entry of that order.  As of the
date of Texaco's emergence from bankruptcy, only two contracts with LP&L remained in
effect out of the original 39 with various purchasers that involved gas routed through the
LIS.  These two contracts expired by January 1, 1993.

B.  Procedural History

On July 3, 1997, the Duhés, Ackals, and Betty Chauvin Roden issued a demand
letter to Texaco on behalf of themselves and four classes of similarly situated royalty
owners throughout Louisiana, seeking recovery of allegedly underpaid mineral royalties
on four different claims.  See R.E. of Appellees #1 (Demand Letter).  One of these is the
gas flow claim, in which the plaintiffs alleged that Texaco improperly paid royalties on
the basis of below-market sales rates in connection with the LP&L contracts.  In
particular, plaintiffs claimed that the market price on November 8, 1978, was over $2.00

per thousand cubic feet ("mcf"), which equates to over $2.00 for one million BTUS,[2] even though Texaco sold the Ackals' gas for $0.26 and $0.34 in connection with the LP&L contracts. See Br. of Appellants at 4. The plaintiffs limited their demand to royalties underpaid after March 23, 1988, the date of the Texaco bankruptcy confirmation order, and simultaneously filed their own actions relating to their demand in federal and state courts.

In response to the letter, Texaco filed this action on August 1, 1997, in the district court asserting diversity and bankruptcy jurisdiction and seeking declaratory relief against the Duhés and Ackals. The Duhés and Ackals voluntarily dismissed their federal action on January 22, 1998, but Texaco removed the state court action to the United States District Court for the Western District of Louisiana on the ground that the gas flow claim implicated the propriety of Texaco's pre-bankruptcy conduct and thereby provided bankruptcy jurisdiction. The district court, however, remanded the case to the state court after the Duhés and Ackals indicated that they were not challenging Texaco's pre-bankruptcy conduct. See Duhé v. Texaco Inc., Civ. No. 97-1453, slip op. at 14-16 (W.D. La. Oct. 27, 1997).

The Duhés and Ackals next filed a motion to stay Texaco's federal action,

_____

[2] Units of gas are measured by volume. The British Thermal Unit ("Btu"), on the other hand, is a unit that measures heating capacity, technically the quantity of heat necessary to raise the temperature of one pound of water one degree Fahrenheit from 58.5 to 59.5 degrees under standard pressure of 30 inches of mercury or near its point of maximum density. Though the heating content of gas varies, one mcf equals roughly one million Btus (or 1 MMBtu). See http://www.natfuel.com/glossary.html.

pending resolution of the claims in state court. The district court, however, denied the motion and thus Texaco's federal action could proceed.

Texaco then filed and the district court granted the motion for partial summary judgment from which the appellants have appealed. In dismissing the Ackals' gas flow claim, the court determined that the price ceilings imposed by Section 105 of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301 et. seq. (repealed), defined the royalty price basis to which the Ackals were entitled. See Texaco, Inc. v. Duhé, Civ. No. 97-1523 (W.D. La. Feb. 16, 2000).

Upon motion of Texaco, the district court directed the entry of a final judgment pursuant to Fed. R. Civ. P. 54(b) by order entered on March 21, 2000.[3] Appellants then filed a timely notice of appeal on April 5, 2000, to this court.

## C. Jurisdiction

This court has jurisdiction over this appeal of a final judgment of the district court pursuant to 28 U.S.C. § 1291. The district court exercised subject-matter jurisdiction over this case involving citizens of different states and an amount in controversy exceeding $75,000 under 28 U.S.C. § 1332.

## II. DISCUSSION

### A. Standard of Review

---

[3] Rule 54 direction for entry of a final judgment was appropriate because the court resolved a claim that was distinct and severable from the remaining claims in the action.

This court reviews an order granting summary judgment de novo, applying the same test the district court employed. See Deas v. River West, L.P., 152 F.3d 471, 475 (5th Cir. 1998). Moreover, we review de novo the district court's interpretation of state law. See McGruder v. Will, 204 F.3d 220, 222 (5th Cir. 2000).

Fed. R. Civ. P. 56(c) provides, in pertinent part, that a court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In determining whether summary judgment is warranted, this court views the record and draws inferences in a light most favorable to the non-moving party. See Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725 (5th Cir. 1995). If a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial, there ceases to be a genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law.

### B. Are the Ackals' Royalties Restricted by the NGPA?

#### 1. Louisiana Royalty Jurisprudence

Louisiana law restricts the value of natural gas royalties to actual sale prices, even when federal price controls govern. See, e.g., Louisiana Land and Exploration Co. v. Texaco Inc., 491 So.2d 363, 367 (La. 1986) (royalty payments on gas flowing and sold under contract as of November 8, 1978, the day before the NGPA became effective, are

–7–

controlled by Section 105 of the NGPA); <u>Shell Oil Co. v. Williams, Inc.</u>, 428 So.2d 798, 802 (La. 1983) (market value must be determined by comparable sales in quality "which also involve the legal characteristics of the gas, that is, whether it is sold on a regulated or unregulated market" and not merely the price the gas would have obtained if sold at that time in the open unregulated market); <u>see</u> <u>also</u> <u>Henry v. Ballard & Cordell Corp.</u>, 418 So.2d 1334, 1338-39 (La. 1982) (if the contract was not unreasonable when entered into, the lessee pays the lessor the fractional part of the value which he is to enjoy from the enterprise, namely the sales price). Therefore, the proper calculation of royalties hinges on the extent to which the NGPA regulated the gas sold under the LP&L contracts.[4]

## 2. The NGPA

Congress adopted the NGPA, 15 U.S.C. §§ 3301 <u>et.</u> <u>seq.</u>,[5] effective November 9, 1978, in response to the escalating energy crisis of the 1970s, thereby creating a uniform pricing system for natural gas in the domestic market.[6] <u>See</u> <u>Public Serv. Comm'n v.</u>

---

[4] Of course, it is beyond dispute that the NGPA governs only the sale of gas and, therefore, does not directly govern transactions between the Ackals (royalty owners) and Texaco (producers). <u>See</u> <u>Piney Woods Country Life Sch. v. Shell Oil Co.</u>, 905 F.2d 840, 851 (5th Cir. 1990) (federal price ceilings do not apply to royalty interests per se, as royalty contracts do not constitute sales within the meaning of the NGPA).

[5] The Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (July 26, 1989), repealed sections 3311 to 3320 of the NGPA.

[6] Throughout this opinion we quote the NGPA in the form originally enacted in Pub. L. No. 95-621, 92 Stat. 3352.

Mid-Louisiana Gas Co., 463 U.S. 319, 322, 103 S.Ct. 3024, 3027 (1983); see also

Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd. of Mississippi, 474 U.S.

409, 420, 421, 106 S.Ct. 709, 716 (1986).  In order to achieve its dual aims of assuring

adequate supplies of natural gas at fair prices, while simultaneously creating incentives

for suppliers to cultivate costly, untapped natural gas reserves, the NGPA bifurcated price

controls between gas flowing by the date of its enactment and "new" gas.[7]  See Pennzoil

Co. v. FERC, 645 F.2d 360, 370-73 (5th Cir. 1981).  Furthermore, the NGPA extended

its pricing mechanisms to the intrastate sale of natural gas under the jurisdiction of the

Federal Energy Regulatory Commission ("FERC").[8]

     For each of the following categories Congress set different price ceilings

permissible by law:

---

[7] "Old" gas included gas dedicated to interstate commerce prior to the enactment of the
NGPA, 15 U.S.C. § 3314, gas sold under pre-existing intrastate contracts, 15 U.S.C. §
3315, gas sold under rollover contracts, 15 U.S.C. § 3316, stripper well gas, 15 U.S.C. §
3318, and gas not otherwise covered, 15 U.S.C. § 3319.  "New" gas includes new natural
gas and gas from new onshore production wells.  See 15 U.S.C. §§ 3312, 3313.  A third
category of gas, "high-cost gas," included gas from new wells producing from a depth
greater than 15,000 feet, gas from geopressured brine, occluded gas from coal seams, and
gas produced from Devonian shale.  See 15 U.S.C. § 3317(c).  However, gas falling in
this category accounted for a small fraction of  aggregate gas supply.  See Richard J.
Pierce, Jr., Natural Gas Regulation, Deregulation, and Contracts, 68 Va. L. Rev. 63, 87-
88 (January 1982).

[8] The 1970s shortage caused producers to divert some gas to the unregulated intrastate
market where they could charge higher prices.  See Energy Reserves Group, Inc. v.
Kansas Power & Light Co., 459 U.S. 400, 414 n.19, 103 S.Ct. 697, 706 n.19 (1983)
(citing Federal Trade Commission, Staff Report of the Bureau of Economics, J.
Mulholland, The Economic Structure and Behavior in the Natural Gas Production
Industry 10 (1979)).

(1) Section 102 - New Natural Gas
(2) Section 103 - Gas from New, Onshore Wells
(3) Section 104 - Old Interstate Gas
(4) Section 105 - Old Intrastate Gas
(5) Section 106(a) - Interstate Rollover Gas
(6) Section 106(b) - Intrastate Rollover Gas
(7) Section 107 - High-Cost Natural Gas
(8) Section 108 - Stripper-Well Gas
(9) Section 109 - "Other" Gas

See 15 U.S.C. §§ 3311 to 3320.

Section 105, governing price ceilings for sales under existing intrastate contracts,

provides in relevant part:

> (a) Application. - The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on the day before the date of the enactment of this Act.
>
> (b) Maximum Lawful Price -
>
>> (1) General Rule.- Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of
>>
>>> (A) the price under the terms of the existing contract, to which such natural gas was subject on the date of the enactment of this Act, as such contract was in effect on such date; or
>>>
>>> (B) the maximum lawful price, per million Btu's, computed for such month under section 102 (relating to new natural gas).

15 U.S.C. § 3315.

The NGPA defines "existing contract" as one for the sale of natural gas that was

in effect on the day before the enactment of the NGPA.  See 15 U.S.C. § 3301(13).  The

term "successor to an existing contract" means "any contract, other than a rollover contract, entered into on or after the date of the enactment of this Act, for the first sale of natural gas which was previously subject to an existing contract." 15 U.S.C. § 3301(14). "First sale" includes, inter alia, the sale of any volume of natural gas to any person for use by such person. See 15 U.S.C. § 3301(21)(A)(iii).

The plain meaning of the statutory language compels the conclusion that the price ceilings of NGPA Section 105 controlled the gas sold in connection with the LP&L contracts.[9] The LIS contracts with LP&L were executed prior to November 9, 1978, involved the sale of natural gas to an "end-user" (thereby constituting a "first sale" of gas as defined by the statute), and committed natural gas exclusively to the intrastate market.

Appellants suggest that to the extent that the NGPA governs their royalties, the expiration of most of Texaco's LIS contracts prior to March 23, 1988, the date of the bankruptcy confirmation and discharge order, rendered the volume of their formerly allocated gas reserves available for sale as "rollover" gas. In other words, they argue that Texaco should have treated the portion of the Bateman Lake Field gas that previously was sold under expired contracts as Section 106(b) "rollover" gas subject to higher price ceilings and royalties. The Section 106 ceiling price was at least $1.00 per million Btus, as compared to the LP&L contract prices of $0.26 and $0.34. See 15 U.S.C. §

---

[9] See INS v. Phinpathya, 464 U.S. 183, 189, 104 S.Ct. 584, 589 (1984) ("in all cases involving statutory construction, our starting point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used") (quotations and citations omitted).

3316(b)(1).

Appellants misread the statutory language.  Section 106(b) governs "any first sale under any rollover contract of natural gas which was not committed or dedicated to interstate commerce on the day before the date of the enactment of this Act."   15 U.S.C. § 3316.  The NGPA defines a "rollover contract" as:

> any contract, <u>entered into on or after the date of the enactment of this Act</u>, for the first sale of natural gas <u>that was previously subject to an existing contract which expired</u> at the end of a fixed term (not including any extension thereof taking effect on or after such date of enactment) specified by the provisions of such existing contract, as such contract was in effect on the date of the enactment of this Act, whether or not there is an identity of parties or terms with those of such existing contract.

15 U.S.C. § 3301(12) (emphasis added).

The LP&L contracts under which the Ackals' gas was sold after March 23, 1988, however, were executed before November 9, 1978, and remained in full force until January 1, 1993.  Moreover, the 1982 compromise Agreement between LP&L and Texaco did not - for purposes of the NGPA - materially alter the original, pre-1978 contracts by obligating Texaco to deliver additional gas that was "previously subject to an existing contract which expired" or by extending the expiration dates of the original contracts.  As there was not a rollover, Texaco's intrastate sales to LP&L - even those involving gas reallocated from LIS contracts that expired prior to March 23, 1988 - were subject only to section 105, as first sales under "existing," or "successors" to existing,

intrastate contracts.

Appellants rely on various FERC rulings but these decisions in fact support our conclusion.[10] In In re Mobil Producing Texas & New Mexico, Inc., 20 FERC ¶ 61,440, 1982 WL 40443, at *5 (Sept. 30, 1982) , the Commission characterized a contractual amendment to an old gas contract as a rollover contract because the amendment, adding five years to the existing contract, occurred on the date that the fixed term of the existing contract was to expire. Likewise, in In re Getty Oil Co., 23 FERC ¶ 61,114, 1983 WL 39442, at *5 (Apr. 20, 1983), gas was designated "rollover" only because the previous contracts expired before the new one went into effect. See generally In re Texaco Inc., 16 FERC ¶ 61,220, 1983 WL 33484, at *1 (Sept. 23, 1981) ("There are two prerequisites to a 'rollover' in section 2(12): (1) the fixed term of the existing contract must expire and (2) a new contract or amendment must be entered into (on or after date of enactment).").

Appellants argue in the alternative that Section 109 of the NGPA supplied the price ceiling for their gas because the LIS contracts were "warranty" contracts, obligating the producer to deliver to the purchaser certain quantities of gas without specifying a particular gas supply source. As such, they maintain that their gas supplies, whether or not allocated in fact by Texaco pursuant to the LP&L contracts, were not "subject to" an

_____

   [10]  See Falcon Petroleum v. FERC, 642 F.2d 780, 783 n.3 (5th Cir. 1981) (FERC's construction of relevant regulatory statutes and its own regulations afforded substantial deference) .

existing contract within the meaning of Section 109.  See 15 U.S.C. § 3319.[11]

Accordingly, they claim that sales of their gas under the LP&L contracts triggered the

higher Section 109 "pricing provision of last resort," ECEE, Inc. v. FERC, 645 F.2d 339,

359 (5th Cir. 1981), of at least $1.45 per million Btus, adjusted for inflation from April of

1977.  See 15 U.S.C. § 3319.

This argument fails for a number of reasons.  First, as Texaco correctly points

out, the 1982 Compromise Agreement specifically dedicated gas from the Bateman Lake

Field to the LP&L contracts to "the maximum extent possible."  See R.E. of Appellees #2

(Affidavit of Gary Taylor at ¶¶10-11).  As the 1982 Agreement was a "successor"

dedication contract (one that dedicates specific gas reserves) to an existing intrastate

warranty contract executed before the enactment of the NGPA, gas allocated to the two

LP&L contracts extant after 1988 remained within the pricing scope of Section 105.

Furthermore, even if the Ackals' gas had not been committed expressly to a

particular contract, the NGPA makes plain that the Section 109 catch-all provision does

not come into play because the Ackals' gas clearly was covered by Section 105.  Section

105(a) provides "[t]he maximum lawful price computed under subsection (b) shall apply

to any first sale of natural gas . . . sold under any existing contract or any successor to an

existing contract, which was not committed or dedicated to interstate commerce on the

---

[11] Section 109, addressing sales of gas not otherwise covered by the pricing provisions of the NGPA, extends inter alia to "natural gas which was not committed or dedicated to interstate commerce on the day before the date of the enactment of this Act and which was not subject to an existing contract on such day." 15 U.S.C. § 3319 (emphasis added).

-14-

day before the date of the enactment of this Act." (Emphasis added.). 15 U.S.C. § 3315(a). Section 105(b) determines the proper price ceiling of gas sales to which Section 105 applies in the first place as it provides that "the maximum lawful price under this section shall be the lower of . . . the price under the terms of the existing contract, to which such natural gas was subject on the date of the enactment of this Act, as such contract was in effect on such date." 15 U.S.C. § 3315(b)(1)(A).

Thus, for Section 105 price ceilings to apply, the gas only need be sold "under" intrastate contracts in existence before the NGPA was adopted. In this case, the Ackals' gas was sold "subject to the authority, control, guidance, or instruction of"[12] the existing or successor Texaco/LP&L contracts and, therefore, any royalties generated therefrom fall directly within the ambit of Section 105, not Section 109.

Moreover, the Ackals' gas in fact was "subject to" the LP&L contracts in existence as of November 9, 1978, when the NGPA became effective. As soon as Texaco delivered Bateman Lake Field gas to LP&L in fulfillment of its delivery obligations, the gas at that moment was "governed by" the terms of the contract in question. See Black's Law Dictionary 1425 (6th ed. 1990) ("subject to" means "governed or affected by"); see also Webster's Third International Dictionary (1998 ed.) ("One that is placed under the authority . . . of someone or something."). That Texaco, before November 9, 1978, could

---

[12] "Under" as defined by Merriam-Webster's Collegiate Dictionary, http://www.m-w.com.

-15-

have fulfilled its contractual obligations without subjecting the Ackals' gas to the LP&L contacts is irrelevant. Texaco also might have assigned the Ackals' gas to an exclusive dedication contract entered into after November 9, 1978, thereby precluding their gas reserves from being "subject to" Section 105. It did not, and for purposes of the applicability of the NGPA, the fact that Texaco made its allocation by an exercise of discretion is immaterial.

The argument advanced by appellants -- that gas from a specified reserve cannot be subject to a warranty contract because the producer can substitute gas from another source -- equates the term "subject to" in Section 109 with "subject only to." See Br. of Appellants at 49 ("gas is 'subject to' a contract if it is sold pursuant to a dedication contract, but is not 'subject to' a contract if it is sold pursuant to a warranty contract"). In so doing, appellants' proffered interpretation subverts the precise language adopted by Congress, thereby transgressing the cardinal rule of statutory construction that "every word has some operative effect." United States v. Nordic Vill. Inc., 503 U.S. 30, 36, 112 S.Ct. 1011, 1015 (1992); see also CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737 (1993) (". . . the task of statutory construction must in the first instance focus on the plain wording of [a] clause, which necessarily contains the best evidence of Congress' intent").

To be sure, this court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 99, 112 S.Ct. 2374, 2383-84 (1992) (internal quotation marks

and citations omitted); see also Deal v. United States, 508 U.S. 129, 132, 113 S.Ct. 1993, 1996 (1993) (accurate interpretation depends on parsing the structure and language of the statute in the context in which it is used). Nevertheless, these considerations warrant the identical conclusion. As we previously discussed, Congress intended Section 105 of the NGPA to protect consumers from exorbitant energy rates by fixing prices for old, intrastate gas sold under existing contracts. Practically speaking, the determination of whether the gas was dedicated to specific contracts or merely delivered pursuant to broader, warranty contracts obligating the producer to deliver certain quantities of gas without regard to its source, makes little difference in terms of achieving the desired result: ensuring that states regulate their endogenous markets in accordance with the overall national scheme. See Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 420-21, 103 S.Ct. 697, 709 (1983). Had Congress intended to exclude warranty contracts from the price ceilings of Section 105, it easily could have written Section 105 to make the distinction. The statute, however, does not do so and no principle of statutory interpretation grants us judicial license simply to rewrite statutory language by ascribing additional, material terms as suggested by appellants. In short, as there is no basis to conclude that warranty contracts are exempt from Section 105, Section 109 is inapplicable to the LP&L contracts.[13]

---

[13] Appellants place undue emphasis on Amoco Production Co. v. United States, 17 Cl. Ct. 590 (1989), for the proposition that Section 105 does not apply to gas sold under a warranty contract. In that case, the Claims Court affirmed an administrative decision of the Interior Board of Land Appeals ("IBLA") that Amoco was bound to pay royalties

### 3. Implied Covenant To Market

Appellants advance one more argument to circumvent the restriction of their royalty price basis to the NGPA-regulated price ceilings under Section 105. They argue that Texaco breached its marketing obligation implied under Louisiana law by failing in 1978 to market prudently their gas to higher-paying markets before the price freeze NGPA imposed went into effect.[14] In other words, appellants suggest that the Bateman

based on its lease obligations as determined by the United States Geological Services ("USGS") in 1977. See id. at 594. However, the portion of the case suggesting that Section 105 did not apply was dicta: the disposition of the case turned on whether the NGPA superseded and nullified the original royalty valuation established by the USGS, notwithstanding the applicability of Section 105. See id. (finding that Amoco had agreed to the royalty values set by the USGS in 1977 that were higher than its contract prices, regardless of whether Section 105 limited the price that Amoco actually could receive for the gas). As such, the portion of the holding regarding the application of Section 105 to warranty contracts is not binding on this court. See Kastigar v. United States, 406 U.S. 441, 454-55, 92 S.Ct. 1653, 1662 (1972) (broad and unnecessary language of an opinion could not be considered binding authority). Moreover, to the extent that tangential judicial language can constitute persuasive authority, see Ayoub v. INS, 222 F.3d 214, 215 (5th Cir. 2000) (per curiam), its weight in this case is nullified by the manner in which the Claims Court arrived at its conclusions. In rendering its decision, the court left undisturbed the judgment of the IBLA that warranty contracts were outside the ambit of Section 105 simply because it was grounded in a rational basis. See Amoco, 17 Cl. Ct. at 594 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285-86, 95 S.Ct. 438, 4211-42 (1974) (the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). The fact that the Claims Court deferred to the IBLA's judgment without conducting its own independent or meticulous review of the relevant text and legislative history of the NGPA and without citation to authority, severely curtails the significance of the holding.

[14] Appellants initially argued before the district court that the natural gas consumed by LP&L physically could not have been delivered from the Bateman Lake Field reserves and, therefore, that their royalties should not have been calculated on the basis of NGPA restrictions to the LP&L contracts. However, they do not advance that argument here, see Br. of Appellants at 3, n.3 ("the deliverability issue is not implicated in this appeal"), and

-18-

Lake Field natural gas became subject to the Section 105 price ceilings on November 9, 1978, only as a result of Texaco's lack of good faith in soliciting higher rates of return for their gas reserves on the open market. Consequently, by vitiating its common-law duty, Texaco became liable for royalty payments in excess of those otherwise appropriate under the actual NGPA-qualified sales.

Appellants are correct that Louisiana law imposes a duty on producers to exercise reasonable diligence in securing a market for the gas they produce, including obtaining the best price reasonably possible.[15] See Frey v. Amoco Prod. Co., 603 So.2d 166, 174-75 (La. 1992); Shell, 428 So.2d at 803; see also La. Rev. Stat. Ann. § 122 (2000) & Comment (discussing the obligation to produce and market minerals discovered and capable of production in the manner of a "reasonable, prudent operator").

This implied duty ensures that owners of mineral interests negotiate willingly with producers, whose capital and proficiency are required to cultivate and maximize the exploitation of discovered gas reserves that remain vital to this nation's continued economic prosperity. If a producer imprudently solicits contracts for royalty owners'

---

instead subsume it within the larger issue they advance on this appeal of Texaco's lack of diligence in seeking out buyers willing to pay higher prices. See Br. of Appellants at 32, n.13 (the issue "is merely a particularly graphic illustration of the grievous nature of Texaco's imprudent and self-serving allocations . . . [of the Ackals' gas] to the lowest-priced contracts that Texaco held, even if the gas could not be physically delivered there").

[15] In addition, the Bateman Field Unitization Agreement obligates Texaco to pay royalty on the basis of the "reasonable value" of the Ackals' gas.

natural gas its obligation to pay royalties is not limited to the agreed-upon proportion of

the producer's revenues because the royalties do not reflect accurately the economic

benefit accruing from the land.  Put differently, the producer's bad-faith frustrates the

parties' arms-length allocation of proportionate risks and rewards.  While royalty owners

legitimately cannot expect the highest rates of return from their mineral or natural gas

interests, they can expect returns consistent with the bargained-for exchange: reasonable

rent for the intended use of the land.  As the Louisiana Supreme Court declared in Henry

v. Ballard & Cardell:

> . . . if the contract was not reasonable when
> entered into, if it is not at a minimum fair and
> representative of other contracts negotiated at
> the time in the field, then a different result
> obtains. Then the lessee has not protected his
> lessor in discharging his duty to market the gas,
> and there is no policy in the law requiring the
> courts to protect the lessee in interpreting the
> lease.

418 So.2d at 1339; see also Shell, 428 So.2d at 803 (finding that lessors had discharged

their royalty obligations properly under the terms of two leases because their marketing

decisions were "prudently made" and therefore "were in the best interest of both the

producers and the royalty owners").

However, appellants' argument that the value of their gas should not be measured

by Section 105 of the NGPA because Texaco breached its marketing obligation when the

price controls became effective in 1978 fails procedurally because they did not present it

to the district court. In the proceedings in the district court appellants challenged Texaco's prudence only with respect to reallocating gas previously devoted to the expired LIS contracts (what appellants erroneously have dubbed "rollover" gas) to the remaining LP&L contracts <u>after</u> <u>1988</u>. In other words, appellants did not argue or cite facts to suggest that Section 105 should not govern the LP&L contracts as of 1978 because of Texaco's improper conduct <u>then</u>. <u>See</u> Defendants' Memorandum in Opposition, Record Vol. #4, p. 578 ("the Ackals were entitled to royalty payment on their rollover gas based on the rollover price . . . [s]ince the Ackals' gas could have been sold as the Section 106 price ceiling . . . Texaco acted imprudently"); <u>see</u> <u>id.</u> at 583 ("Texaco's royalty owners are not bound by Texaco's reallocation of their gas to the remaining LP&L contracts" because these allocations were imprudent); <u>see</u> <u>id.</u> at 586 ("It would obviously be imprudent for a producer to obligate additional volumes of gas to a contract far below market value.").

Consequently, the district court addressed only two unrelated arguments that appellants proffered as to why the NGPA price ceilings never governed the royalties on their gas to begin with in 1978 -- the deliverability and warranty issues. <u>See</u> <u>Texaco, Inc. v. Duhé</u>, Civ. No. 97-1523, slip op. at 7-9 (W.D. La. Feb. 16, 2000).

In fact, the record suggests that the Ackals expressly repudiated arguments based on Texaco's bad faith in committing the Bateman Lake Field gas pursuant to the LP&L contracts in 1978 or to the Compromise Agreement in 1982. Anticipating that Texaco would seek to use its bankruptcy discharge to veil alleged improprieties arising before

-21-

1987, the Ackals brought a motion to dismiss Texaco's bankruptcy defense on the grounds that they were not challenging pre-bankruptcy conduct. See Defendants' Memorandum in Support of Motion for Partial Summary Judgment (Bankruptcy Defense), Record Vol. #7, p. 934-35 ("Defendants do not challenge the prudence, validity, or propriety of the LP&L Settlement, any contracts between Texaco and LP&L, or any sales to LP&L . . . Defendants' claims are limited to underpayments on or after March 23, 1988, and therefore Defendants do not challenge any pre-bankruptcy acts on the part of Texaco Inc.") (emphasis in original).

Likewise, in moving in the district court for it to abstain while their actions were pending before the state court, appellants averred: "there are no claims which Proposed Class Representatives are bringing against Texaco in the State Suit which arise prior to confirmation of Texaco's bankruptcy . . . The actions of Texaco prior to March 23, 1988 have not been put at issue." Defendants' Memorandum in Support of Expedited Motion for Abstention and Stay of Proceedings, Record Vol. #1, p. 80-81 (emphasis in original).

Thus, quite apart from the waiver issue, the Ackals run afoul of equitable principles by maintaining a position irreconcilable with one they previously asserted at an earlier stage of the proceeding. See United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993) ("Judicial estoppel is properly defined as a bar against the alteration of a factual assertion that is inconsistent with a position sworn to and benefitted from in an earlier proceeding.") (quoting Mark J. Plumer, Note Judicial Estoppel: The Refurbishing of a

Judicial Shield, 55 Geo. Wash. L. Rev. 409, 435 (1987)).  Litigants undermine the integrity of the judicial process when they deliberately tailor contradictory (as opposed to alternate) positions to the "exigencies of the moment."[16]  McCaskey, 9 F.3d at 378; see also Lewandowski v. National R.R. Passenger Corp., 882 F.2d 815, 819 (3d Cir. 1989) ("such use of inconsistent positions would most flagrantly exemplify that playing fast and loose with the courts which has been emphasized as an evil the court should not tolerate") (quoting Scarano v. Central R. Co., 203 F.2d 510, 512-13 (3d Cir. 1953) (internal punctuation omitted)).[17]

Consequently, as no exceptional circumstances are present,[18] appellants' failure to argue earlier that Texaco marketed the Ackals' gas imprudently before the enactment of the NGPA - indeed their explicit disavowal of that position - bars them from doing so for the first time on appeal.  See Watts v. Kroger Co., 170 F.3d 505, 511 (5th Cir. 1999);

---

[16] Judicial estoppel is distinct from equitable estoppel (sometimes called "estoppel in pais" and "collateral estoppel"), which focuses on the relationship between the parties and applies where one of the parties detrimentally has relied upon the position taken by the other party in an earlier proceeding.  In those circumstances, the party that induced reliance is estopped from subsequently arguing a contrary position.  See Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598-99 (6th Cir. 1982).

[17] We recognize that it is not clear that appellants' changing positions mid-litigation prejudiced Texaco, as the district court denied appellants' motion to abstain and did not resolve a motion they made to dismiss a Texaco bankruptcy defense Texaco raised. Nevertheless, we think that judicial estoppel should apply here.

[18] See Crawford v. Falcon Drilling Co., 131 F.3d 1120, 1123 (5th Cir. 1997) (courts may review an issue of law raised for the first time on appeal in "exceptional circumstances").

Clark v. Aetna Cas. & Sur. Co., 778 F.2d 242, 249 (5th Cir. 1985); see also 9A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure §§ 2588, at 599 (2d ed. 1995).[19]  Moreover, we find no support for the proposition that the duty to market prudently implied under Louisiana law required Texaco to breach the LP&L contracts or the 1982 Settlement Agreement by affirmatively reallocating the Ackals' gas to higher paying markets after 1988 in an effort to evade the Section 105 price ceilings that went into effect as of 1978.  Accordingly, as Texaco sold the Ackals' gas pursuant to existing intrastate contracts, appellants' royalties were limited to the percentage of the sales prices as governed by Section 105 of the NGPA.

### III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

---

[19] As appellants have waived the imprudent marketing argument, we need not address Texaco's claim that its 1988 discharge in bankruptcy insulates it from liability for pre-NGPA conduct, nor its argument regarding the prescriptive period on suits for mineral royalties.